2 Cal.Rptr.3d 903 (2003)
110 Cal.App.4th 1594
The PEOPLE, Plaintiff and Respondent,
v.
Donald Thomas WRIGHT, Defendant and Appellant.
No. C039031.
Court of Appeal, Third District.
August 4, 2003.
Review Granted November 12, 2003.
*905 Madeline McDowell, under appointment by the Court of Appeal, Sacramento, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Senior Assistant Attorney General, Carlos A. Martinez, Supervising Deputy Attorney General, Aaron R. Maguire, Deputy Attorney General for Plaintiff and Respondent.
*904 SIMS, Acting P.J.
Defendant Donald Thomas Wright appeals from a judgment entered following jury verdicts finding him (1) guilty of the second degree murder of Edward Sanchez, with personal use of a firearm (Pen.Code, §§ 187, subd. (a), 12022.53, subd. (d));[1] (2) guilty of assault with a firearm on Clarence Redoble, with personal use of a firearm (§§ 245, subd. (a)(2), 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)); and (3) legally sane when the crimes were committed. Defendant contends among other things that the trial court erred in the guilt phase by preventing the jury from hearing directly from witnesses who observed defendant's behavior before the shooting, evidence which defendant sought to use on the issue of his state of mind in connection with his theory of imperfect self-defense. We agree and shall conclude the evidentiary or in the guilt phase requires reversal of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
On March 21, 2000, an information was filed alleging that on November 15, 1999, defendant murdered Edward Sanchez (§ 187) and assaulted Clarence Redoble with a firearm (§ 245). It was also alleged in an amended information that defendant was ineligible for probation and eligible for added punishment due to his personal use of a firearm in connection with the charged offenses. (§§ 1203.6, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subd. (d).) A third count of discharging a firearm at an inhabited house was added by amendment but later dismissed.
Defendant pleaded not guilty and not guilty by reason of insanity.
The jury trial of the guilt phase began on June 11, 2001.
The prosecution presented the following evidence in the guilt phase:
The shooting occurred around 12:30 a.m., November 15, 1999.
Laura Sanchez, wife of murder victim Edward (Eddie) Sanchez, testified her family moved next door to defendant in 1996. She considered defendant an acquaintance rather than a friend. On the evening of Sunday, November 14, 1999, she and her extended family were watching videos at her house. Laura became tired and went to her bedroom to sleep. She was awakened by Eddie, who came in *906 to get the cordless telephone. She fell back to sleep and was awakened by four or five gunshots (shortly after midnight, as reflected by other evidence). She found her husband on the living room floor with a gunshot wound in his abdomen. He told her defendant had shot him. She did not see any weapon on her husband. There was a barbecue fork on her porch, but she did not know how it got there.
Laura's sister, Tracey (Deanne) Roberts, testified that earlier in the day, before the shooting, Deanne answered the telephone at the Sanchez house. It was defendant, and he wanted her to come to his house because he needed a friend. She thought the request was "weird" and declined. Defendant wanted to talk to Eddie, but Deanne made an excuse (that Eddie was asleep or not there) and ended the call.
Eddie's brother, Anthony Sanchez, testified that about a month before the shooting, defendant knocked on the door of the Sanchez home and told Anthony someone was trying to break into Eddie's car, but not to worry because defendant had a gun, which he showed to Anthony. Anthony did not know defendant well but thought defendant was "a little off and "kind of odd." Shortly before the shooting, Anthony saw Eddie "patting ... down" defendant's jacket, asking if he was "packing." Anthony remained on the couch watching the television. He saw Eddie's silhouette pass across the big-screen television. Eddie passed from the kitchen to the front door with a barbecue fork sticking up out of his back pocket. Eddie never pulled the fork out of his pocket.
The first police officer arrived at 12:40 a.m. on November 15, 1999. Eddie later died as a result of the gunshot wound.
Assault victim Clarence Redoble, who was shot immediately after Eddie, testified at trial as a prosecution witness, though some testimony favorable to the defense was elicited on cross-examination. Redoble, who was convicted of selling methamphetamine in 1989, testified he and defendant were friends and neighbors for about four or five years before the shooting. Redoble helped defendant around the house; defendant had trouble moving around and at times used crutches and had a nurse come to his home to work on his leg or ankle. Redoble testified defendant had been the victim of a home invasion robbery in 1998, during which he was tied up and robbed by someone he believed to be a family member. At times, defendant thought Eddie Sanchez had something to do with the robbery. After the home invasion robbery, defendant changed; he became fearful and thought people were following him and trying to get into his house. At times, he would become convinced people were digging under the ground or coming through his attic or crawlspace. Redoble said the digging was just the neighbor's barbecue pit, and Redoble checked the attic and crawlspace and told defendant there were no signs of intrusion, but defendant did not believe him. When defendant's cat sat staring at the carpet, defendant was convinced the cat detected a person under the house.
One instance of defendant's fearfulness occurred about a week before the shooting. Redoble went up into the attic and told defendant there was no indication of people being up there, such as disturbance of insulation. Redoble did not think defendant was reassured.
Around 10:00 a.m. on November 14,1999 (the day before the 12:30 a.m. shooting), Redoble, after smoking some methamphetamine, went to visit defendant. Defendant thought someone was trying to get into his house and wanted to borrow Redoble's two pit bulls. Defendant mentioned people he suspected, including Eddie Sanchez and *907 his family. Between 11:00 a.m. and 1:00 p.m. on November 14, 1999, Redoble returned to defendant's house with the pit bulls and enclosed them in the two-and-a-half-foot-tall crawlspace under the house. Throughout the day, Redoble returned to feed the dogs, move them to defendant's backyard, and work on fixing a drill for defendant. Defendant had several visitors during this time. Around 10:00 p.m., Redoble went to his own home briefly and returned with his girlfriend to find defendant had locked himself out of his house. It was raining and cold. Redoble approached with his hands in his pockets. Defendant asked him to take his hands out of his pockets. Redoble did so, thinking the request strange, even for defendant. Defendant told Redoble to keep his hands out of his pockets.
Redoble suggested breaking a small window pane in a side door to gain entry (and replacing it the next day), but defendant declined, stating he had a Triple A service for lockouts. Defendant wanted to go to the Sanchez home next door to call for the locksmith. Redoble offered to call from his house, but defendant got "mad a little bit" and said it would take too long. Redoble was concerned about defendant going to the Sanchez house because, as stated by Redoble, "I thought he [defendant] was tripping and I didn't want no hassles started."
Redoble characterized defendant's fears as paranoid hallucinations or "tripping," but believed defendant knew right from wrong. Redoble tried to get defendant to wait while Redoble went to the Sanchez home to use the phone. Defendant wanted Redoble's girlfriend to wait too. Redoble did not like that idea. Redoble went and knocked on the Sanchez door. Defendant followed.
Redoble asked Eddie to look up the phone number for Triple A lockout service and call. Eddie called, but got no answer. Eddie invited Redoble and defendant to enter, because it was cold. Redoble and defendant stood in a hallway near the front room where Sanchez's family was watching television. They offered a chair to defendant, who was on crutches, but he declined. Eddie said he called a locksmith who agreed to come out. Redoble and defendant started to leave, but after Redoble stepped out of the house, defendant stopped, leaned on the door, and said to Eddie, "show me your back yard." Eddie was perplexed by the request and said no because it was raining, and defendant might slip and fall or get bitten by Eddie's dogs. Defendant insisted on seeing the back yard. Other Sanchez family members asked them to close the door before the babies got sick. Redoble urged defendant to leave. Eddie stood up and walked toward defendant, saying they had to close the door so the baby would not get sick. Although Eddie had nothing in his hands, defendant asked Eddie if he had a gun. Eddie responded to the effect, "No, I ain't got no gun. What do you mean got a gun? What do I need a gun for? What are you talking about?" Defendant put his hand in his pocket. Eddie got close to defendant, patted defendant's jacket, stepped back in surprise saying, "What, do you got a gun," at which point defendant fired the gun.
Redoble yanked on defendant's arm, and defendant turned and fired the gun towards Redoble. The bullet grazed Redoble's hip, and his elbow sustained a gunpowder burn.
Eddie's brother, Anthony Sanchez, also witnessed the shooting and testified defendant fired the gun without warning, then walked out the front door. Defendant stood on the porch holding the gun. He started to point the gun at Anthony. Anthony and his brother John Sanchez tackled defendant to the ground and beat him.
*908 John Sanchez testified that before the shooting Eddie had picked up a meat fork in the kitchen and put it his back pocket. John asked why. Eddie said, "[d]on't worry about it" but seemed a bit upset. John returned to the front room. Eddie then came to the front room and told defendant he was unable to obtain a locksmith (contrary to other witnesses). Eddie told defendant to leave, but defendant refused to leave. John testified Eddie never removed the meat fork from his back pocket. Defendant then said he was leaving but instead turned and shot Eddie without warning. John did not tell the police about the meat fork.
A meat fork from the Sanchez home was found outside, approximately two feet from the house.
A forensic pathologist described Eddie's bullet wound as a "distant range injury," meaning the gun could have been shot from a minimum of two to six feet, depending on variables. The pathologist opined the distance was greater than three or four feet.
The defense presented the following evidence during the guilt phase:
Defendant was taken to the hospital after being beaten by the Sanchez brothers. A doctor testified defendant tested positive for amphetamines (central nervous system stimulants), benzodiazepines (the general term for drugs like valium), and opiates. Defendant had various injuries, including head injuries and a fractured wrist. He lost consciousness and did not recall what had happened.
Another doctor testified he treated defendant in June 1999 for a broken tibia (the bone between the knee and ankle joints). Defendant kept putting weight on the leg, causing a displacement that required surgery, performed on September 8, 1999, to avoid permanent disability. The doctor prescribed narcotics. The doctor saw defendant for a follow-up visit on October 19, 1999, and told him to use crutches to walk. The doctor did not recall any obvious signs of bizarre thought process in defendant.
In the guilt phase, the defense called as an expert witness Dr. Charles Schaffer, a psychiatrist who evaluated defendant at the court's request in connection with his insanity plea.
Dr. Schaffer interviewed defendant for an hour and 45 minutes in March 2001. Defendant was coherent. He did not remember the shooting itself. He remembered being in the Sanchez home, preparing to leave, saying to Eddie, "[y]ou've got a weapon," and seeing Eddie reach for defendant's coat. Defendant's next memory was being in the hospital. Dr. Schaffer learned that defendant had been the victim of a home invasion robbery in September 1998, during which two men whom he knew restrained him, punched him, and robbed him, in his own home.
Dr. Schaffer testified that in making his assessment, he reviewed various records, including reports of statements made by various persons who knew defendant and/or observed defendant exhibit strange behavior in the months before the shooting; defendant was convinced people were following him and planting microphones in his house and crawling around under his house and in his attic. As we discuss post, the trial court erroneously precluded defendant from presenting these persons as witnesses at trial and excluded from evidence the tape of a 911 call defendant made to police on November 14, 1999, wrongly believing his house was being robbed.
Dr. Schaffer concluded that on November 15, 1999, defendant was "probably experiencing a[n] ... amphetamine induced psychotic disorder, with delusions." This *909 conclusion was based on (1) symptoms that defendant experienced at the time of the incident according to the records; (2) defendant's report that he was taking methamphetamines during the period before the incident; (3) reports from people who knew him that he was taking methamphetamine; and (4) the positive drug test taken after the shooting.[2]
Dr. Schaffer explained "psychotic" means the person has severe symptoms such as delusions (beliefs or thoughts not based in reality), hallucinations, or other extremely strange thoughts. With amphetamine-induced psychotic disorder, one symptom can be paranoid delusions, which are delusions where the person feels he or she is being victimized or at risk to be persecuted or harmed. Dr. Schaffer concluded that, before the shooting, defendant had such delusions. The doctor also believed defendant had a chronic mood disorder at the time he interviewed defendant, which may have existed on November 15.
Dr. Schaffer also reviewed a report of a Dr. Sokolov, who interviewed defendant and reported that defendant said that, in the week before the shooting, Eddie Sanchez was harassing him, and it was "getting out of hand." Defendant thought Eddie was "running the whole" conspiracy against defendant. Dr. Schaffer said Dr. Sokolov reported that defendant said he had two reasons for going to the Sanchez home the night of the shooting: (1) to call a locksmith, and (2) to confront Eddie about harassing him. Defendant said he had the gun on him because he normally carried it after he was robbed. Defendant told Dr. Sokolov (but not Dr. Schaffer) that Eddie said, "We have a serious problem," and "You [defendant] have to be taken care of." All of a sudden, the Sanchez brothers started coming at him. Defendant said to Eddie, "You have got a weapon." The next thing defendant remembered, he was on the front lawn.
Another defense witness, clinical neuropsychologist Dr. John Wicks, testified about concussions and amnesia, and said repeated forceful blows to the head with a metal crutch could cause a concussion with temporary loss of consciousness and a period of amnesia.
The prosecution did not present any rebuttal witnesses.
The jury was instructed on imperfect self-defense, and defense counsel argued to the jury that defendant's mental state, consumed by paranoia and vulnerability, precluded a murder conviction, and supported an imperfect self-defense theory that defendant honestly but unreasonably believed he was in imminent peril.
The case was submitted to the jury, which on June 22, 2001, returned verdicts finding defendant not guilty of first degree murder, but guilty of the second degree murder of Eddie Sanchez, and guilty of assault with a firearm on Clarence Redoble. The jury also found true the firearm use enhancements.
The case proceeded to a jury trial of the sanity phase. The parties stipulated that all evidence presented in the guilt phase may be considered by the jury in the sanity phase. Upon defendant's attempt to revisit the matter of exclusion of defense witnesses, the trial court again excluded the witnesses as cumulative to Dr. Schaffer's testimony, but the court allowed the jury to hear the tape of defendant's 911 call to the police.
*910 On June 27, 2001, the jury returned a verdict finding defendant was legally sane at the time of the commission of the crimes.
The trial court denied defendant's motion for a new trial and sentenced him as follows: (1) On count one, murder (§ 187), 15 years to life, plus 25 years to life on the gun use enhancement (§ 12022.53, subd. (d)), for a total indeterminate term of 40 years to life; and (2) on count two, assault with a firearm (§ 245, subd. (a)(2)), three years, plus a four year gun enhancement (§ 12022.5, subd. (a)(1)), for a total of seven years on count two, for a total aggregate sentence of seven years plus 40 years to life.

DISCUSSION

I. Exclusion of Defense Evidence Re: Mental State

Defendant argues reversal of the judgment is required because the trial court erroneously excluded defense evidence in the guilt phase and sanity phase going to the issue of defendant's state of mind. We need not address the sanity phase, because we shall conclude the exclusion of defense evidence in the guilt phase was reversible error.

A. Background

On June 18, 2001, after the prosecution rested in the guilt phase and before the defense began presenting its case, the People submitted a written "People's Bench Brief re: Hearsay Evidence and Limitations on Defense Expert Testimony," in which the People argued that, if the defense expert testified to opinion based in part on hearsay statements, the court should give the following proposed jury instruction:
"When an expert testifies concerning an opinion based on reports and statements of other people, those reports and statements are considered hearsay because they are made outside the Court, and the persons who make them are not subject to cross-examination. You may consider those reports and statements only for the purpose of showing the information upon which the expert relied. You are not to assume that the information in the reports and statements is necessarily true or untrue."
However, when the defense sought to call as witnesses those persons whose statements provided a basis for the expert's opinion, the People succeeded in barring such witnesses on the ground their testimony would be cumulative. The People thus effectively withdrew the proposed instruction, as reflected in the reporter's transcript of court proceedings outside the presence of the jury on June 18, 2001, as follows:
"[Defense Counsel]: Good morning, Your Honor. [ķ] I guess after discussions in chambers with respect to my prospective witnesses for today, the Court has given us an inclination with respect to what its opinion is in these witnesses. [ķ] What I would like to do would be to tell you what my intention was and give you a thumbnail offer of proof and then let the DA argue about [his motion to exclude the defense evidence].
"THE COURT: Why don't you go ahead. The record needs to be clear about what it is we're doing.
"[Defense Counsel]: The first witness was a gentleman by the name of Bill Alkire, who is [defendant's] uncle. Basically he raised [defendant] from about age one to age 15 and they kept in contact as adults. [ķ] Mr. Alkire is an elderly gentleman, and he was coming in to testify to how [defendant] had changed subsequent or after the home invasion robbery, and most notably how [defendant] was acting *911 either the day of or very proximate to the shooting. [ķ] As [defendant] was over at his house, had been driven there, brought back by a Sheriffs Deputy, and then taken home by Mr. Alkire's nephew.
"Depending upon how Mr. Alkire did with his memory as he is quite elderly, I did have Craig Wickman (phonetic) who would testify to what happened when he drove [defendant] home in that period of time when he was over at Mr. Alkire's house. [ķ] Mr. Wickman lives with Mr. Alkire. The family puts him up, so they would testify to those things.
"Second witness was Cindy Fajardo (phonetic). [ķ] She would testify that she lived with [defendant] for a period of time, that she knew him as a home health care individual, observed him change after the home invasion robbery, and get a little worse after the â after he broke his leg. [ķ] And she will testify to the nature of some of his conduct and his paranoia with respect to her, and in general how he sort of progressively changed. Also, with respect to his medical condition and medications.
"I had Officer Mezinarz (phonetic) as a prospective witness who was the responding officer on the home invasion, and she would testify to the nature of what happened to him in the home invasion, what was related.
"Officer Funksinda (phonetic) was the officer who responded on two occasions, including one the day before on the 14th, or actually the day, depending upon how you look at it where this happened, where he responded to [defendant's] residence in response to a 911 call [defendant] placed thinking that he was being robbed and that there were people in his house.
"Also, the 911 tape that [defendant] placed, I aspired to bring that into evidence, and that has [defendant] himself speaking to what he believes is happening to his house and to him, and that's on the 14th of November, 1999.
"I think those are relevant when his mental state and intent issue [sic ] is in issue. It's hearsay for a non hearsay purpose.
"THE COURT: All right. Mr. [Prosecutor].
"[Prosecutor]: My objection to the witnesses that he's enumerated, is that it's largely cumulative. [ķ] In fact, it's totally cumulative to what his psychiatrist will testify to tomorrow, and that is, that Dr. Schaffer relied upon all the reports that the defense has made, that is, statements from all these witnesses and the other evidence that he's mentioned. [ķ] That's been reviewed and considered by the psychiatrist in forming his opinion. [ķ] And he reviewed and considered, you know, probably about ten times more statements than that, but those were just a few of the ones he's already looked at and considered.
"I am not contesting that the statements he read are true. I mean, if the witnesses come in, I wouldn't intend on suggesting in any way that they were making this stuff up. [ķ] Clearly the Defendant was acting erratic and bizarre in the week leading up to this crime, and so it seems that it would be cumulative.
"And my cross-examination of the psychiatrist is going to focus more on the statements that the Defendant himself has made and how that [led] to this particular doctor's ultimate conclusion, and not the individual statements that he relied on.
"THE COURT: All right. Mr. [defense counsel],
"[Defense Counsel]: Your Honor, with respect to the cumulative point, my concerns were[:][O]ne, I didn't know that that was going to be the prosecution's position; but secondly, should the motion be granted, *912 it will dictate to a certain degree what evidence is presented on those particular points, vis-[ā]-vis the psychiatrist's memory, and should there be a failure of memory or something else along those lines, the jury would not be allowed to hear the actual event or incidence [sic], and that concerns me. And that was one of the main reasons I brought them in.
"THE COURT: You mean if the doctor fails to remember that he relied on [sic]?
"[Defense Counsel]: If the doctor said, you know, `Oh, I know I relied on something but I have no recollection as to what Ms. Fajardo said about [defendant's] condition,' or `I know he was over at his uncle's but, you know, I reviewed a lot of things. I don't have it.' [ķ] I would request that those things happen and that I be allowed to call these witnesses, and I am not saying I agree with the cumulative point. [ķ] I am saying should that happen, I don't want the prosecution to be able to dictate my case in that fashion.
"THE COURT: All right. Is the matter submitted?
"[Prosecutor]: Yes.
"[Defense Counsel]: Submitted.
"THE COURT: As far as the two civilian witnesses and the two officers are concerned, and the 911 tape as well, the real issue here is the defendant's behavior and what that can show this jury as to his mental state at the time that the shooting occurred.
"The [d]octor, Dr. Schaffer, is going to testify presumably that he is aware of what each of these four witnesses would say and that he took that into consideration in reaching his conclusion regarding [defendant's] mental state, the conclusion that the law allows him to testify about. [ķ] So assuming Dr. Schaffer testifies that he has relied on all of these things and can give some account of what those things were, the testimony of these witnesses would be cumulative because the jury isn't going to be, and the [defendant isn't going to be deprived of this evidence. [ķ] The evidence is going to be brought in through the doctor's testimony and that's the avenue through which it should be placed before the jury, I think, because the doctor is the one who is giving the medical opinion about his mental condition.
"If the doctor fails to recall what any of these witnesses said in the unlikely event that he can't recall with enough specificity so that it might reflect on the quality of his diagnosis, then I would think that that witness could be called to testify what they said earlier butâ or perhaps the report could be used. [ķ] But as I say, we'll have to cross that bridge when we come to it. [ķ] I would expect Dr. Schaffer to be thoroughly prepared and be able to defend his diagnosis under cross-examination.
"So it would appear to me that the witnesses] [and] the 911 tape at this point are cumulative because they are a component of Dr. Schaffer's testimony and that's something that he's going to testify to in some detail when he does take the stand.
"So what I will do then is grant the People's motion to at this point exclude the testimony of these witnesses, subject to further argument after Dr. Schaffer testifies, [ķ] Once we know what his testimony is, then we'll know if the testimony of any of these people is no longer cumulative and whether or not it would be relevant."
With respect to the witnesses specifically named in the foregoing offer of proof, Dr. Schaffer's testimony consumed only seven pages of reporter's transcript. Dr. Schaffer said Mr. Alkire was defendant's uncle and had helped raise him. Mr. Alkire related that, after defendant was the victim of a home invasion robbery, defendant became very vulnerable and was "always *913 concerned about people trying to get home [sic] or stealing items from him." After defendant's foot surgery, he became more fearful. Defendant thought people were "surveying his house" and had installed microphones in and around his house to listen to his conversations, and he expected something bad to happen. Mr. Alkire received a visit from defendant on the day of the shooting, before the shooting. Defendant was acting "really strange," and he was shaking and more fearful about something bad happening. Defendant left but returned with a police officer who gave him a ride after his car broke down. Mr. Alkire asked the officer to take defendant to a hospital because he was "looking bad," and defendant's behavior frightened Mr. Alkire. Mr. Alkire got his nephew to give defendant a ride home.
Dr. Schaffer testified he also considered a report from the nephew, who related defendant was "acting weird" and "talking about strange things." Defendant said people were after him, people had followed him around, entered his house, and planted microphones. At night, defendant could hear voices in the attic and heard people crawling underneath his house. As the nephew drove defendant home, defendant said cars were chasing him, and the same cars had followed him on other occasions. When they arrived at defendant's home, defendant asked the nephew to check the whole house to make sure nobody had entered. The nephew did so, did not find anything out of the ordinary, and left.
Dr. Schaffer also testified he reviewed a report from defendant's half-sister Cindy Fajardo, who lived with defendant for several months before the shooting. She said defendant became very afraid right after his home invasion robbery. He told her on several occasions that people had bugged the house and were out to get him. She got tired of defendant waking her up in the middle of the night because he felt someone was in the house. She decided to move. He accused her of being part of the conspiracy against him. He was mad that she did not see or hear what he claimed was happening. She felt the injury to his foot "aggravated his paranoia."
Dr. Schaffer also testified he reviewed law enforcement records concerning defendant's 911 call to police on November 14, the day before the shooting. Defendant said he thought intruders were in his house, and he heard noises and gunshots in the attic and crawlspace. A responding officer found no substance to defendant's concerns and said defendant seemed paranoid, stating people were trying to get in through the roof and crawlspace, and someone was trying to put a satellite dish on his roof so they could beam rays down from space and take over his body. The officer had responded to a similar call from defendant a week earlier, on November 9.
Dr. Schaffer also testified concerning reports he reviewed of statements by other people. A home security system salesman visited defendant in his home in September or October 1999 in response to defendant's interest in obtaining a security system. According to the salesman, defendant's hands were shaking, and he had a terrified look on his face. Defendant put his index finger over his lips, signaling to be quiet, and said people were "out to get him" and had bugged his house. Dr. Schaffer also reviewed a report that a neighbor, Joaquin Miranda, said defendant seemed relatively normal until six months before the shooting, when he became increasingly paranoid about people trying to kill him. Miranda once saw defendant in his backyard wearing a headset which he said could detect people in his yard and attic. The day before the shooting, defendant called out to Miranda from his back yard, saying he *914 had been shot in the back. Miranda examined defendant but saw no gunshot wound. Later the same day, Miranda saw defendant walking around his front yard carrying a handgun, talking about people "ripping him off," and saying Eddie Sanchez was somehow involved.
The persons to whom Dr. Schaffer referred did not testify at the guilt phase.
The jury was instructed, in part, with respect to expert opinion: "In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion. [ķ] An opinion is only as good as the facts and reasons on which it is based. [ķ] If you find any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion."

B. Analysis

The Attorney General first argues that defendant waived any evidentiary error by failing to ask the trial court to reconsider its ruling after Dr. Schaffer testified. According to the Attorney General's brief, the trial court "noted" defendant could proffer the witnesses after Dr. Schaffer's testimony if defendant still wished to call them. The Attorney General's position on waiver is insupportable. The record, as set forth ante, shows the trial court merely indicated willingness to revisit the matter only if Dr. Schaffer's memory failed him (which it apparently did not). We conclude defendant did not waive his contention of evidentiary error.
We now turn to the merits.
The People contend that the excluded evidence of defendant's delusional state was irrelevant to a claim of imperfect self-defense. Preliminarily, we note that the People's evidentiary objection in the trial court was that the evidence was cumulative, not that it was irrelevant. Nevertheless, we shall first determine whether evidence of defendant's delusions was relevant to the defense theory of imperfect self-defense. The parties touch on this issue in connection with defendant's contention that the trial court erred in refusing to instruct the jury with defendant's proposed modification of the imperfect self-defense instruction, which would have told the jury expressly that there need not be a reasonable basis for defendant's belief in the need to defend, and the belief may be predicated on delusion. We need not resolve the claim of instructional error, because we shall conclude erroneous exclusion of evidence compels reversal of the judgment. Nevertheless, we note the Attorney General's discussion of the instruction acknowledges "courts have at least indicated in dicta that a defendant can claim imperfect self-defense so long as he has an actual [fn. omitted] but unreasonable belief that danger is imminent and that lethal force is necessary to prevent death or great bodily injury, notwithstanding the fact that the belief may be a product of delusions, mistaken perception, or intoxication. (See In re Christian S. (1994) 7 Cal.4th 768, 771 [30 Cal.Rptr.2d 33, 872 P.2d 574]; People v. Cameron (1994) 30 Cal.App.4th 591, 601 [36 Cal. Rptr.2d 656] [`[E]vidence of intoxication could be material to the defense of unintentional killing in the course of "imperfect self defense."']; People v. Uriarte (1990) 223 Cal.App.3d 192, 197 [272 Cal.Rptr. 693] [`A defendant's mental state is the same when he kills ... whether such belief is the product of a delusion or a mistaken interpretation....']; People v. Flannel (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].)"
*915 In his reply brief, defendant commendably discusses a recent opinion, potentially adverse to defendant's position, which was published after the filing of the People's respondent's brief in the instant appeal, and which held imperfect self-defense cannot be predicated upon delusions alone. However, the California Supreme Court has granted review in that case, People v. Gregory (2002) 101 Cal.App.4th 1149, 124 Cal.Rptr .2d 776, thus depriving the case of any precedential value. (Cal. Rules of Court, rule 976(d).) We nevertheless invited supplemental briefing on the question of relevance of delusions to imperfect self-defense.
The Attorney General argues there must be some objective basis in fact, apart from a delusion in order to sustain a defense of imperfect self-defense. Assuming for the sake of argument the Attorney General is correct, we note that in the case now before us, defendant's imperfect self-defense theory was not founded solely on a delusion. Thus, there was evidence that the victim had placed a barbecue fork in his back pocket, for possible use in dealing with defendant. A forensic pathologist testified the fork could cause a deep laceration if pushed with sufficient force. There was also evidence that the victim approached defendant and touched defendant's jacket. Although prosecution witnesses said the victim never removed the barbecue fork from his back pocket, the fact remains that there was objective evidence of peril other than defendant's delusions.
In these circumstances, we see no reason to conclude that imperfect self-defense cannot be predicated on delusions. In People v. Uriarte, supra, 223 Cal.App.3d 192, 272 Cal.Rptr. 693, the defendant requested a jury instruction that would have told the jury he was guilty of manslaughter rather than murder if the jury found that as a result of his delusional mental state, he honestly but unreasonably believed the killings were necessary to prevent imminent great bodily injury to his wife. (Id. at pp. 196-197, 272 Cal.Rptr. 693.) The prosecution argued that theory applied only where there was some reasonable objective basis for the defendant's unreasonable belief, and an honest belief caused by voluntary intoxication did not eliminate the malice necessary for murder. (Id. at p. 197, 272 Cal.Rptr. 693.) The trial court refused defendant's request for the jury instruction. The appellate court said: "Because [defendant's] theory for requesting the instruction is correct, we were initially sympathetic to his argument that the instruction should have been given. The focus of Flannel [supra, 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1] is that a person who honestly believes there is an imminent threat to his own life or the lives of others cannot harbor malice. Nowhere does Flannel suggest that only `reasonably unreasonable' defendants may avail themselves of its rationale. A defendant's mental state is the same when he kills in the honest-but-mistaken belief that the victim was reaching for a gun whether such belief is the product of a delusion or a mistaken interpretation of the victim's reaching for his car keys." (Uriarte, supra, 223 Cal. App.3d at p. 197, 272 Cal.Rptr. 693.) The Uriarte court nevertheless went on to conclude there was no basis for reversal of the judgment, because there was no substantial evidence that danger was imminent or that lethal force was necessary. (Ibid.)
We are aware of case law holding that the mistake-of-fact defense under section 26[3] cannot be predicated upon delusions *916 which are the product of mental illness. (People v. Gutierrez (1986) 180 Cal.App.3d 1076, 1083-1084, 225 Cal.Rptr. 885.) Gutierrez described policy reasons for this result, i.e., that a mentally ill defendant should not be allowed to obtain complete exoneration (as would be the case under section 26) because he may represent a continuing threat to the community, and he has already been accommodated by the rules allowing for ah NGI (not guilty by reason of insanity) plea, by allowing evidence of mental illness to prove the absence of specific intent, and by permitting consideration of mental illness as a mitigating factor for sentencing purposes. (Id. at p. 1084, 225 Cal.Rptr. 885.) We see no reason to extend Gutierrez to imperfect self-defense cases, where the delusions are used to reduce murder to manslaughter, not to obtain complete exoneration. The California Supreme Court, in concluding the legislative elimination of diminished capacity did not eliminate imperfect self-defense, observed there is a difference between a claim of imperfect self-defense, which is based on a defendant's assertion that he lacked malice under section 188[4] because he acted under an unreasonable mistake of fact, and the complete defense of mistake of fact under section 26. (In re Christian S., supra, 7 Cal.4th 768, 779, fn. 3, 30 Cal.Rptr.2d 33, 872 P.2d 574.)
Though not cited by the parties, we are aware the Fifth Appellate District held in People v. Padilla (2002) 103 Cal.App.4th 675, 126 Cal.Rptr.2d 889, that evidence of a hallucinationâ a perception with no objective realityâ was inadmissible to negate malice so as to mitigate murder to voluntary manslaughter, but was admissible to negate deliberation and premeditation so as to reduce first degree murder to second degree murder. However, Padilla expressly stated it was not addressing imperfect self-defense (which had been disavowed by the defendant), but only provocation and heat of passion. (Id. at p. 678, fn. 3, 126 Cal.Rptr.2d 889.)
We conclude that, assuming there had to be some objective evidence of the need for self-defense, there was such evidence in this case and the excluded evidence of delusions was relevant to the defense theory of imperfect self-defense.
The trial court excluded the testimony of defendant's witnesses as cumulative to the testimony of the defense expert, Dr. Schaffer, who testified he reviewed comments made by these persons.
Evidence Code section 352[5] gives the trial court discretion to exclude cumulative evidence. A trial court's exercise of discretion under Evidence Code section 352 is reviewable for abuse and will not be reversed unless the court exercised its discretion *917 in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (People v. Ochoa (2001) 26 Cal.4th 398, 437-438, 110 Cal.Rptr.2d 324, 28 P.3d 78; People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125, 36 Cal.Rptr.2d 235, 885 P.2d 1.) As we shall explain, this is the rare case in which the trial court abused its discretion.
Thus, the right to present a defense is a component of the federal guarantee of due process of law. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, Chambers v. Mississippi [(1973) 410 U.S. 284, 302, 93 S.Ct. 1038], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants `a meaningful opportunity to present a complete defense.' [Citations.]" (Crane v. Kentucky (1986) 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 [exclusion of testimony as to circumstances of confession violated defendant's right to present defense, where such testimony was offered to show the confession was unworthy of belief]; see also, People v. Zapien (1993) 4 Cal.4th 929, 1002-1003, 17 Cal.Rptr.2d 122, 846 P.2d 704; People v. Page (1991) 2 Cal.App.4th 161, 184-186, 2 Cal.Rptr.2d 898.) Subject to this constitutional guarantee, the trial court retains wide latitude to exclude evidence that is repetitive or only marginally relevant or poses an undue risk of prejudice or confusion of the issues. (Crane v. Kentucky, supra, 476 U.S. at pp. 689-690, 106 S.Ct. 2142.)
As stated by the California Supreme Court:
"In general, the `"[application of the ordinary rules of evidence ... does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citations.] [The California Supreme Court has] recognized, however, that Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of significant probative value to his or her defense. (People v. Babbitt (1988) 45 Cal.3d 660, 684 [248 Cal.Rptr. 69, 755 P.2d 253].)" (People v. Cunningham (2001) 25 Cal.4th 926, 998-999, 108 Cal. Rptr.2d 291, 25 P.3d 519.)
"Relying on Washington v. Texas (1967) 388 U.S. 14 [87 S.Ct. 1920, 18 L.Ed.2d 1019] and its progeny, defendant asserts that the trial court's authority under Evidence Code section 352 to exclude relevant evidence must yield to his constitutional right to present a defense. The principle applies, however, only to `relevant and material' evidence. [Citations.] As the court correctly stated in People v. Reeder (1978) 82 Cal.App.3d 543 [147 Cal.Rptr. 275]: `Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of significant probative value to his defense. In Chambers v. Mississippi [supra, 410 U.S. 284, 93 S.Ct. 1038], it was held that the exclusion of evidence, vital to a defendant's defense, constituted a denial of a fair trial in violation of constitutional due process requirements. [ķ] We do not mean to imply, however, that a defendant has a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352.' [Citations.]" (People v. Babbitt, supra, 45 Cal.3d 660, 684-685, 248 Cal.Rptr. 69, 755 P.2d 253 [holding the defendant's evidence failed to meet the threshold requirement of relevance].) The cited case, People v. Reeder, supra, 82 Cal.App.3d 543, 147 Cal.Rptr. 275, held the trial court prejudicially erred in excluding under Evidence Code section 352 evidence of significant probative value *918 to the defense which carried a danger of substantial prejudice to a codefendant. (Id. at p. 553,147 Cal.Rptr. 275.)
As stated by the California Supreme Court: "As a general matter, the `[application of the ordinary rules of evidence ... does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, `[t]he trial court's ruling was an error of law merely; there Was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension. (Chapman v. California (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].)" (People v. Fudge (1994) 7 Cal.4th 1075, 1102-1103, 31 Cal.Rptr.2d 321, 875 P.2d 36.)
Here, the testimony of the various witnesses who were excluded was not simply "marginally relevant" (Crane v. Kentucky, supra, 476 U.S. 683, 689,106 S.Ct. 2142, 90 L.Ed.2d 636) nor offered on a "minor or subsidiary point" (People v. Fudge, supra, 7 Cal.4th 1075, 1103, 31 Cal.Rptr.2d 321, 875 P.2d 36). Defendant's mental state was the lynchpin of his defense. The testimony of various witnesses (including police officers) who would testify as to defendant's paranoid behavior in the months, weeks, and days preceding the trial was crucial to the defense's position that defendant's delusional mental state was not falsely fabricated after he committed the crime.
It is no answer that plaintiffs expert, Dr. Schaffer, was permitted to summarize the testimony of these witnesses. In a different context, our Supreme Court has recently described the importance of the ability of the jury to view the demeanor of a witness. Thus, our Supreme Court has recognized that the United States Supreme Court, "in discussing the constitutional right of confrontation, emphasized that the opportunity for the trier of fact to observe a witness's demeanor was as important a component of the right of confrontation as the defendant's opportunity to cross-examine the adverse witness.... `[T]he confrontation clause "envisions `a personal examination and cross-examination of the witness in which the accused has an opportunity ... of compelling [the witness] to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' [Citation.]"' ... [Thus, the United States Supreme Court] `has indicated that both interestsâ cross-examination and the opportunity to observe the demeanor of the witnessâ are not lightly to be disposed of in the criminal, fact-finding process.' [Citation.]" (People v. Arreola (1994) 7 Cal.4th 1144, 1155, 31 Cal.Rptr.2d 631, 875 P.2d 736, citing inter alia Ohio v. Roberts (1980) 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597.) The case before us is different in that it was the defense's own witnesses, rather than prosecution witnesses, who were excluded, but the principle remains that the opportunity to observe the demeanor of a witness is crucial to the jury's determination of credibility.
In this case, the trial court's exclusion of defense witnesses prevented the jury from seeing and hearing from, inter alia, police *919 officers who had personal knowledge of defendant's bizarre behavior in the days before the crime. Each excluded witness was not allowed to "stand face to face with the jury, in order that they [could] look at him and judge by his demeanor upon the stand and the manner in which he [gave] his testimony whether he [was] worthy of belief." (People v. Arreola, supra, 7 Cal.4th 1144, 1155, 31 Cal.Rptr.2d 631, 875 P.2d 736.)
Considering all circumstances we conclude the exclusion of the defense witnesses deprived defendant of his right to present a defense in violation of his state and federal constitutional rights to due process of law.[6] Exclusion of the witnesses therefore constituted an abuse of discretion under Evidence Code section 352. (People v. Reeder, supra, 82 Cal. App.3d 543, 553-554, 147 Cal.Rptr. 275 (opn. of Jefferson, J.).)
The test of harmless error is whether the error is harmless beyond a reasonable doubt. (Chapman v. California, supra, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.)
On this record, the error is not harmless. The record tenders abundant evidence that defendant was mentally ill and was suffering from paranoid delusions at the time of the crime. Indeed, this record tenders no motive other than mental illness for defendant's shooting of his neighbor. We cannot say beyond a reasonable doubt that, had the jury heard testimony from live witnesses (including police officers), substantiating defendant's paranoid behavior, that the jury would have reached the same result. The judgment must be reversed.
We conclude the trial court erred during the guilt phase of trial, by excluding defense witnesses concerning defendant's state of mind, and the error was prejudicial, requiring reversal of the judgment. We need not address defendant's other contentions (i.e., evidentiary error during the sanity phase; instructional error; and sentencing error).

DISPOSITION
The judgment is reversed.
We concur: DAVIS, and MORRISON, JJ.
NOTES
[1] Undesignated statutory references are to the Penal Code.
[2] Dr. Schaffer referred to comments of a neighbor, Joaquin Miranda, who believed, based on the amount of traffic in and out of defendant's house, that defendant was selling drugs.
[3] Section 26 states: "All persons are capable of committing crimes except those belonging to the following classes: [ķ] ... [ķ] Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."
[4] Section 188 provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [ķ] When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."
[5] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."
[6] The trial court also erred in excluding from evidence the 911 tape.