[No. D010050. Fourth Dist., Div. One. Aug. 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO U. URIARTE, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part 2 of the Discussion section.

COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis and Pamela A. Ratner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WIENER, Acting P. J.**—In the first portion of a bifurcated trial, a jury convicted Francisco U. Uriarte of one count of first degree murder (Pen. Code, §§ 187, 189)[2], one count of second degree murder (*ibid.*), and two counts of attempted murder (§§ 664 and 187). On the attempted murder counts it found that Uriarte had inflicted great bodily injury. (§ 12022.7.) The jury also found that Uriarte used a firearm in the commission of these crimes. (§ 12022.5.) In the second portion of the trial, the jury determined that Uriarte was sane at the time of the shootings. On motion for new trial, the court reduced the conviction in count one to second degree murder. It then sentenced Uriarte to the maximum possible term of 38 years to life.

Uriarte argues the trial court erred in failing to give a requested instruction and abused its discretion in imposing consecutive sentences. As we shall explain, we disagree and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 1985, friends, family members and acquaintances of Uriarte noticed stark changes in his behavior. Strong circumstantial evidence attributed these behavioral changes to Uriarte's use of cocaine and marijuana and his abuse of alcohol. Uriarte's problems included hallucinations. He would "see" animals in the house and look for nonexistent people under the furniture.

In October 1987, Uriarte's wife Elma was operated on for the removal of a kidney. Elma's illness disturbed Uriarte greatly. He appeared nervous, unsettled and demanding. Elma remained in the hospital from October 12 through October 16.

---

[2] All statutory references are to the Penal Code unless otherwise specified.

At approximately 9:30 p.m. on October 15, Uriarte knocked at the door of Jo Fish's apartment in the same complex where Uriarte lived. Uriarte had a blank expression and smelled of alcohol. He looked worried and spoke to Fish in Spanish. Deanna Roberts, a friend of Fish's visiting at the time, understood a little Spanish and testified Uriarte was saying something about his wife. He tried to look into the apartment. Fish tried to tell him she did not understand. Uriarte left after several minutes but returned three times over the next half hour. On each occasion he asked about his wife and attempted to look into the apartment. Each time Fish and Roberts explained they did not understand him.

John Alva was in his apartment in the same complex that evening talking with two friends, Jay and Nancy Constantino. At approximately 10 p.m., Alva responded to a knock at the door and observed Uriarte standing in the doorway. Alva had seen Uriarte around the complex periodically and had spoken with him about six times.

When Alva first opened the door, Uriarte was wildly waving a semiautomatic pistol. He accused Alva and the Constantinos of holding his wife in a closet and of laughing at him. Alva, who spoke Spanish, responded that he didn't even know Uriarte's wife. At that point, the Constantinos got up to leave the room. Uriarte said, "Nobody's leaving" and started shooting. Jay Constantino was shot first, followed by his wife and Alva. Both Constantinos died. Alva was shot three times before he fell. After that, Uriarte entered the apartment and shot at Alva again.[3]

Uriarte left Alva's apartment and encountered Donald Bessette, a neighbor who was running towards Alva's apartment to investigate the shots. Bessette saw Uriarte stuff a handgun into the waistband of his pants. He appeared "bewildered" and "confused." Although Bessette spoke only English and Uriarte only Spanish, Bessette testified that Uriarte said to him, "Go look. I shot them people."[4]

As Uriarte fled from the apartment complex, Thomas Eberwein was sitting in the garage of his parents' house nearby. When Eberwein heard the sounds of someone attempting to climb a chain link fence across the street, he walked down the driveway to investigate and found Uriarte moving

---

[3] Deanna Roberts testified that after Uriarte left Jo Fish's apartment for the third time, she heard two bangs which sounded like firecrackers. After Uriarte left for the fourth time, Roberts heard a series of loud bangs. She went downstairs to investigate but returned to her apartment immediately when she heard someone had a gun.

[4] Bessette was impeached by the testimony of a defense investigator who interviewed him following the preliminary hearing. Bessette allegedly told the investigator that Uriarte spoke to him as he walked past but Bessette did not understand what was said.

toward him. Uriarte slowed down and then stopped within several feet of Eberwein. Eberwein asked what was going on. Uriarte raised a pistol from his side and shot Eberwein as he tried to duck. Eberwein yelled as Uriarte started to run away. Uriarte turned, raised the pistol with both hands and pointed it at Eberwein. When Eberwein ducked behind some parked cars, Uriarte ran away without firing another shot.

Uriarte was caught and arrested a short distance from Eberwein's garage. He repeatedly told the deputy sheriffs making the arrest, "They abused her. They abused her." He explained to one of the deputies, "I shot them because they took advantage of my wife." He also said he had used cocaine a short while ago and needed some more. A search incident to Uriarte's arrest yielded a bag with 14.8 grams of cocaine. Later at the Lemon Grove sheriff's station, Uriarte stated that the people he had shot "deserved to die."

Considerable evidence was introduced concerning Uriarte's use of drugs, consumption of alcohol and bizarre behavior in the days and hours prior to the shootings. Two psychiatrists testified. Both independently concluded Uriarte was suffering from a delusional mental state at the time of the shootings caused principally by his abuse of cocaine. Such a mental state, according to the doctors, means that the subject misperceives reality. He may see things which are not there. He believes things are true which are not.

At the sanity phase of the trial, both doctors testified to their opinion that Uriarte was insane at the time of the shootings. The prosecution introduced no contrary medical testimony. The doctors conceded, however, that Uriarte's delusions were the product of a temporary "cocaine psychosis" which would generally last as long as the intoxicating effects of the cocaine. Relying on a standard CALJIC sanity phase instruction (No. 4.02)[5] and *People* v. *Kelly* (1973) 10 Cal.3d 565, 576-577 [111 Cal.Rptr. 171, 516 P.2d 875], the prosecutor argued that any insanity attributable to Uriarte was not "settled" because it disappeared as the cocaine itself was dissipated.[6]

## DISCUSSION

### 1. *Honest-but-unreasonable Belief Instruction*

■ Uriarte requested an instruction (CALJIC No. 5.17) which would have informed the jury he was guilty of voluntary manslaughter rather than

---

[5] Unless otherwise indicated, all CALJIC references are to the fifth edition bound volume, 1988.

[6] We have some difficulty understanding why the criminal liability of a defendant—otherwise insane under the applicable test—should turn on how long the insanity lasts where such duration is unrelated to anything the defendant has done.

murder if it found that as a result of his delusional mental state, Uriarte honestly but unreasonably believed the killings were necessary to prevent imminent great bodily injury to his wife.[7] (See generally *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) The prosecutor argued that the *Flannel* principles apply only where there is some reasonable objective basis for the defendant's unreasonable belief. He asserted that an honest belief caused by voluntary intoxication does not eliminate the malice necessary for murder.[8] The trial court ultimately refused to give the requested instruction.

Because Uriarte's theory for requesting the instruction is correct, we were initially sympathetic to his argument that the instruction should have been given. The focus of *Flannel* is that a person who honestly believes there is an imminent threat to his own life or the lives of others cannot harbor malice. Nowhere does *Flannel* suggest that only "reasonably unreasonable" defendants may avail themselves of its rationale. A defendant's mental state is the same when he kills in the honest-but-mistaken belief that the victim was reaching for a gun whether such belief is the product of a delusion or a mistaken interpretation of the victim's reaching for his car keys.

But it must be remembered that the *Flannel* honest-but-unreasonable belief doctrine, which mitigates the culpability of a homicide, derives directly from traditional common law doctrines of self-defense and defense of others which completely justify certain homicides if the defendant's belief is both honest *and* reasonable. In order to justify a homicide under these traditional principles, the defendant must have reason to believe that the danger is *imminent* and that lethal force is *necessary* to prevent death or great bodily injury. (See Pen. Code, § 197, subd. 3; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) §§ 239, 241-242, pp. 275-276, 277-279; CALJIC No. 5.12 (1989 rev.).) Consistent with its doctrinal foundations, *Flannel* recognizes that in order to warrant a conviction of manslaughter rather than murder, the defendant must honestly (if unreasonably) believe that serious injury is imminent and that lethal force is necessary. (25 Cal.3d at p. 674.)

The evidence in this case, viewed most favorably to Uriarte, suggests the shootings of Alva and the Constantinos were motivated by his

[7] CALJIC No. 5.17 reads in pertinent part: "A person, who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an honest but unreasonable belief is not a defense to the crime of [voluntary] . . . manslaughter."

[8] The prosecutor argued, "[CALJIC] 5.17 is not applicable for him. [¶] . . . It's for reasonable men and women operating under an unreasonable set of circumstances with an unreasonable belief. But it must be a reasonable belief. He doesn't have a reasonable belief because he is on cocaine."

belief that they were holding his wife Elma in a closet. While his statement, "They abused her" certainly suggests a perception of physical harm, it is unclear whether he believed additional harm was imminent and would constitute great bodily injury. In any event, assuming Elma was being held in a closet in Alva's apartment and had been abused, there was no evidence that Uriarte believed it was necessary to shoot the victims in order to save Elma. We cannot overcome the fact that Uriarte fired a fourth shot at Alva after he was already incapacitated, which was hardly necessary to rescue his wife. In addition, Uriarte's shooting of Eberwein—who had no even ostensible connection to Elma—undercuts his defense. Absent direct testimony from Uriarte about what he was thinking or circumstantial evidence suggesting his belief in imminence and necessity, there is an insufficient basis for giving the CALJIC No. 5.17 instruction.

In the final analysis, Uriarte—who the facts show to be concededly "crazy" in the colloquial sense of the term—appears to fall into a legal crack between the concepts of "imperfect" defense of others and insanity. Under a more enlightened definition of insanity (see, e.g., *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]) or without artificial distinctions (see *People* v. *Kelly*, *supra*, 10 Cal.3d at pp. 576-577, discussed *ante* at p. 196, fn. 6), Uriarte might be legally as well as colloquially insane. We are bound, however, to work within the present system with its present limitations.

2.   *Sentencing Discretion*\*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

Judgment affirmed.

Work, J., and Froehlich, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 15, 1990.

---

\* See footnote 1, *ante*, page 192.