[No. S119067. May 26, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD THOMAS WRIGHT, Defendant and Appellant.

**COUNSEL**

Madeline McDowell, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Carlos A. Martinez, Janet E. Neeley, Brian R. Means, Janis Shank McLean, John G. McLean and Aaron R. Maguire, Deputy Attorneys General, for Plaintiff and Respondent.

David La Bahn; Steve Cooley, District Attorney (Los Angeles), Patrick D. Moran, Acting Head Deputy District Attorney, and Brent Riggs, Deputy District Attorney, for Appellate Committee of the California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

BROWN, J.—In *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*), we reaffirmed that an actual, though *unreasonable*, belief in the need to defend oneself from an imminent threat of death or great bodily injury negates the malice element of murder, reducing the offense to manslaughter. (See also *People v. Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1].) We granted review in this case to consider whether to extend this "doctrine of imperfect self-defense" (*Christian S.*, at p. 771) to a case in which the defendant's actual, though unreasonable, belief in the need to defend himself was based on delusions and/or hallucinations resulting from mental illness or voluntary intoxication, without any objective circumstances suggestive of a threat. After studying the record, we conclude that we do not need to reach that issue here, because defendant was able to claim imperfect self-defense, the jury heard evidence supporting that defense, and the trial court's exclusion of additional evidence supporting that defense was not prejudicial to defendant. Accordingly, because defendant was not prejudiced by the exclusion of this additional evidence, we reverse the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Prosecution Case*

Eddie and Laura Sanchez and their children moved next door to defendant in April 1996. In the early morning hours of November 15, 1999, defendant visited the Sanchez home, shot and killed Eddie, and then wounded Clarence Redoble, a friend of defendant's who had accompanied him. Eddie had been urging defendant out the door, when defendant pulled out a Kimber .45 pistol, loaded with Black Talon hollow-point bullets, and fired, while members of the Sanchez family sat in the living room watching a movie. According to witness accounts, no argument or threatening conduct preceded the shooting.

The previous day, the Sanchez family had hosted a barbecue. They dug a fire pit in the backyard. Two of Eddie's brothers, John and Anthony, their families, and Laura's younger sister, Tracey, were at the house. This was not unusual. The families were close-knit. Family members visited often and frequently stayed overnight. About a month before the shooting, Anthony was sleeping on the couch at Eddie's house, when he was awakened by defendant knocking on the door. Defendant told Anthony someone was trying to burglarize Eddie's car, and then he said, "Don't worry, I got something for them," showing Anthony a gun he had tucked in his waistband. Anthony's impression was that defendant "was a little off" and "kind of odd."

Clarence Redoble, defendant's friend, lived five minutes away from defendant, and, as he often did, he saw defendant several times on November 14, the day before the shooting. That morning, at defendant's insistence, he brought his pit bulls over to defendant's house and released them in the crawl space under the house as a security precaution. Defendant thought people were trying to gain access to his house by tunneling their way into the crawl space. Redoble went back later to feed the dogs and turned them loose in the backyard.

By nightfall on November 14, the weather had turned cold and rainy. The Sanchez family rented three videos and went inside for a dinner of hot soup and a movie marathon. Some family members watched the movies; others fell asleep. Most of the children were put to bed.

Sometime after 11:00 p.m., defendant called the Sanchez house; Laura's sister Tracey answered the phone. Defendant said he needed to talk to a friend and wanted Tracey to come over. She refused. Defendant asked to speak to Eddie, but Tracey told him Eddie was asleep and then hung up the phone.

Around midnight, Clarence Redoble returned to defendant's house and found him standing outside in the rain. Defendant said he had locked himself out of the house. It was cold, and Redoble had tucked his hands into his jacket pockets, but defendant asked Redoble to take his hands out of his pockets, which made Redoble think defendant was "tripping." Redoble checked the doors and windows to see if there was any way to get into the locked house. Finally, he suggested breaking a small window in the side door, which he could easily repair the next day. Defendant rejected that idea. He wanted to go to Eddie's house to call a locksmith. Redoble thought it was too late to disturb the neighbors, so he offered to go to his own house to call a locksmith. Defendant was adamant. As an alternative, Redoble offered to go next door alone and ask the Sanchezes to call a locksmith so that defendant, who used crutches, would not have to negotiate the path on his crutches in the rain. Defendant stubbornly followed Redoble to Sanchez's door.

Eddie answered Clarence Redoble's knock and invited him and defendant inside. Defendant refused to sit down and remained standing just inside the door, resting on his crutches, while Eddie looked up locksmiths in the telephone book and made a couple of calls.

Defendant's behavior was unusual. According to witnesses, he was mumbling to himself, pointing to different people, saying, "Oh, there's one . . . by the window. Oh, [that]'s her." Clarence Redoble wanted to leave, but defendant resisted. He asked to go to the backyard to see Eddie's dogs. Eddie

refused, explaining it was cold and raining outside and defendant was on crutches. Defendant then started to get aggressive, demanding to see the backyard. Eddie sought to soothe defendant's agitation, telling him, "No one's gonna hurt you here."

At some point during this exchange, Eddie went into the kitchen and put a barbecue fork in his back pocket. Eddie's brother John saw him do so and expressed concern. Eddie said: "Everything's okay. Don't worry about it." Defendant was wearing a jacket, and he kept putting his hand in the jacket pocket, which had a noticeable bulge.

The front door had been opened and cold air was seeping into the house. Eddie asked defendant to leave, telling him the baby would get sick because of the cold air coming in through the open door. Defendant refused, saying, "No, I don't wanna go." He seemed to get upset, and he asked Eddie, "Are you packing?" Eddie answered, "No, what do I need a gun for?" and then asked, "Why? Does he have a gun?" Eddie was standing next to defendant. He patted or frisked defendant's jacket and then stepped back a little. Eddie had nothing in his hands. He never touched the fork in his back pocket. Defendant pulled the pistol from his jacket and fired several shots at Eddie. Clarence Redoble was holding defendant's arm, and when he tried to pull defendant away, defendant turned the gun toward Redoble and fired a shot that grazed Redoble's hip.

Eddie was flung backward by the blast. His body was sprawled on the dining room floor. One of the Black Talon hollow-point bullets, with which defendant had loaded the gun, had lacerated two major blood vessels in Eddie's lower abdomen. After the shooting, Eddie's brother Anthony was the first person to reach defendant, who was standing right outside the door, the gun still in his hand. Defendant turned the gun toward Anthony, but Anthony launched himself at defendant, grabbed his gun hand, and bashed him in the face. Defendant dropped his crutch, and Anthony picked it up and beat defendant until the crutch broke. Anthony thought defendant was trying to get the gun, which had fallen to the ground during the struggle, but John got to it first. John picked the gun up, placed the barrel against defendant's head, but he did not pull the trigger. He took the gun inside the house and placed it on the dining room table.

A patrol officer heard the gunshots and arrived at the scene within two minutes. He found defendant sitting in the middle of the lawn, bloodied but conscious. The paramedics arrived and transported Eddie to the hospital, where he died.

Officers who searched defendant's house after the shooting found more guns and ammunition. They also found a note, written on an old parking ticket, that said, "It might not be Ed, but Jay."

B. *The Defense Case*

As a result of the struggle that followed the shooting, defendant suffered a possible concussion, a fractured right wrist, an abraded and crushed little finger, and metacarpal fractures of his left hand. His toxicological screen was positive for amphetamines, benzodiazepines, and opiates. Defendant also had a number of serious preexisting medical problems. He suffered from osteoarthritis and high blood pressure. A broken leg had healed improperly and had required corrective surgery in September 1999. Defendant had to use crutches until his leg healed and had prescriptions for his various ailments, including pain killers. He supplemented his Social Security disability income by selling drugs.

The jury learned more background information about defendant through the testimony of Dr. Charles Schaffer, a psychiatrist who testified concerning defendant's mental condition. In 1998, defendant was the victim of an aggressive home invasion robbery. Evidence suggested that a family member—perhaps defendant's niece, Corina Fajardo—and other people with whom defendant was acquainted were involved in the robbery. The intruders tied defendant up, gagged him, and beat him, taking money, drugs, and jewelry.

After the robbery, defendant's friends, neighbors, and relatives noticed that his behavior became increasingly bizarre. He seemed more paranoid, nervous, and vulnerable. Cindy Fajardo, defendant's half sister, lived with him for a time, but moved out when defendant accused her of being part of a conspiracy against him. Defendant's leg injury also seemed to increase his paranoia. Defendant went through a complete personality change; he was "tripping . . . thinking the wrong thoughts." Defendant said his cat was acting strangely because it could hear people tunneling under the house. Defendant also believed people were trying to break into his house through the attic and were planting microphones. Defendant inquired from a salesperson named Pete Cabanyon about installing a home security system. One neighbor, Joaquin Miranda, saw defendant wearing a headset that defendant claimed could detect people in the backyard and the attic. The day before the shooting, Miranda heard defendant calling for help. Defendant said that he had been shot, but when Miranda examined him, he found no injuries.

Defendant made repeated 911 calls. He told officers that "someone was trying to put a satellite dish on top of his house so they could beam rays down from space and take over his body." The day before the shooting, he claimed he heard gunshots in the attic, but responding officers found nothing.

Defendant's paranoia often focused on Eddie Sanchez and sometimes on one of Eddie's coworkers, Jay Moffit. He accused Jay and Eddie of stealing from him. He thought there was a "Hispanic conspiracy against him" and that Eddie was "running it." He told people the harassment from Eddie was getting out of hand.

Prior to the shooting, defendant reported he had been "snorting a couple of lines" of methamphetamine every day for at least six months.

Dr. Charles Schaffer personally interviewed defendant, and reviewed statements of friends, relatives, and neighbors, as well as records from the county jail and reports of other mental health professionals, and concluded that at the time of the shooting defendant was suffering from an "amphetamine induced psychotic disorder, with delusions." Dr. Schaffer noted that psychotic symptoms "can include delusions [or] thoughts that are out of touch with reality . . . perceiving things that don't exist . . . seeing things that are not based on any real object . . . ." Defendant denied experiencing any psychotic symptoms at the time of the interview with Dr. Schaffer. He claimed he could remember only bits and pieces of the confrontation with Eddie. He recalled clearly why he went to the Sanchez house. He needed a locksmith, and his auto club card was locked inside the house. He remembered asking Eddie about a weapon and recalled nothing else until he woke up in the University of California hospital.

Although Dr. Schaffer discounted defendant's claim of amnesia, he believed that his diagnosis of psychotic disorder with delusions was sound, based in part on the stories related to him by defendant's relatives and neighbors. He rejected—as highly improbable—the possibility that defendant was malingering. He also opined, in support of defendant's claim of imperfect self-defense, that a person suffering from defendant's symptoms would have a heightened sensitivity to threat, especially when crowded by other people.

Defense counsel sought to have all of the witnesses on whose statements Dr. Schaffer relied, including Joaquin Miranda, Pete Cabanyon, and Cindy Fajardo, testify during the trial. The court sustained the prosecution's objection that this evidence would be cumulative, but left open the possibility the defense could present these witnesses if Dr. Schaffer failed to recall what they said.

The jury found defendant guilty of the second degree murder of Eddie Sanchez (Pen. Code, § 187, subd. (a))[1] and the assault of Clarence Redoble (§ 245, subd. (a)(2)). As to the murder charge, the jury found true an allegation that defendant personally used a firearm in violation of section 12022.53, subdivision (d). As to the assault charge, the jury found true an allegation that defendant used a firearm within the meaning of section 1203.06, subdivisions (a)(1), and section 12022.5, former subdivision (a)(1) (now subd. (a)). In a separate sanity phase of the trial, the jury found defendant was legally sane during the commission of the crimes.

On appeal, defendant argued, among other things, that the trial court erred when it excluded testimony from the witnesses on whose statements Dr. Schaffer had relied in reaching his conclusions. The Court of Appeal found trial court error and reversed the judgment. The court reasoned that this testimony was crucial to substantiating defendant's assertion of imperfect self-defense, and its exclusion prejudicially violated defendant's state and federal due process rights. We granted review.

## II. DISCUSSION

The People assert that a claim of imperfect self-defense must be based on objective circumstances indicating a threat, not on mere delusions or hallucinations arising from voluntary intoxication. The People argue that the evidence in this case does not support imperfect self-defense because the only arguably threatening objective circumstances that preceded defendant's violent outburst were the barbeque fork in Eddie Sanchez's back pocket and the fact that Eddie patted or frisked defendant's jacket. According to the People, these circumstances were not sufficient to support the claim of imperfect self-defense. We need not reach that issue, however. Assuming without deciding that imperfect self-defense applies here, we see no prejudice to defendant in the trial court's ruling that excluded the testimony of his witnesses.

The jury was instructed on the doctrine of imperfect self-defense, and defense counsel was permitted to argue this theory. Moreover, evidentiary support for defendant's imperfect self-defense claim was provided by the testimony of prosecution witnesses Clarence Redoble and Anthony Sanchez, as well as defense expert Dr. Schaffer. Redoble, for example, described in detail defendant's paranoid behavior prior to the shooting, including his belief that he was the target of a possible attack and that people were trying to enter his house. The Court of Appeal reversed solely because the trial court

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

excluded as cumulative the testimony of other witnesses who would have recounted additional incidents reflecting defendant's precarious mental state in the days, weeks, and months preceding the shooting. According to the defense offer of proof, these witnesses would have testified to the circumstances of the home-invasion robbery, how defendant's behavior deteriorated after the robbery, what defendant told police officers who responded to his 911 calls, and how defendant was acting on the day before the shooting.

The substance of this excluded testimony was, however, admitted through Dr. Schaffer, the defense expert who relied on statements from these various witnesses in forming his opinion about defendant's mental state and who described these statements to the jury. The trial court admitted his descriptions without a limiting instruction, and defense counsel elicited details from Dr. Schaffer without a single objection from the prosecution. In addition, the trial court, as already noted, permitted the defense to renew its request to present these witnesses if Dr. Schaffer's testimony was inadequate, and defense counsel chose not to do so, suggesting satisfaction with Dr. Schaffer's testimony.

Thus, the jury heard Dr. Schaffer recount the statement of defendant's uncle that after the home-invasion robbery defendant "became very vulnerable" and was concerned that someone was trying to burglarize his house, that defendant also believed someone was surveilling the house and monitoring his conversations with hidden microphones, and that, on the day before the shooting, defendant was "really strange," "agitated and disturbed," "shaking," and "looking bad," and made his uncle afraid. Dr. Schaffer also recounted the statement of the uncle's grandson that, on the day before the shooting, defendant was "acting weird" and "talking about strange things," such as people entering his home and planting microphones, hearing voices in the attic, seeing people crawling underneath the house, and cars chasing him. Dr. Schaffer further recounted the statement of defendant's half sister who lived with defendant for several months. She reported that defendant became "very afraid right after his home invasion robbery," that he repeatedly woke her up in the middle of the night because he believed someone was in the house, that he believed someone had "bugged" the house and was out to "get" him, that he had accused her of being part of a conspiracy against him, and that she believed his leg injury had exacerbated his paranoia. In addition, Dr. Schaffer recounted the statement of the home security system salesperson who visited defendant in September or October 1999 and reported that defendant was terrified and shaking and believed people had "bugged" his house, were trying to enter the house, and were "out to get him." Dr. Schaffer also recounted the statement of the neighbor who reported that defendant

became increasingly paranoid about six months before the shooting, claimed people were stealing from him and trying to kill him, asserted that his headset could detect intruders, and falsely declared on the day before the shooting that he had been shot in the back. Finally, Dr. Schaffer described the 911 call on the day before the shooting, in which defendant claimed that there were intruders in the house, that he had heard gunshots in the attic and the crawl space under the house, and that someone was trying to install a satellite dish on his roof. Dr. Schaffer described the conclusion of the police officer who responded to the call and found no basis for defendant's concerns. In short, through Dr. Schaffer's testimony, the jury heard the substance of what all these witnesses had to say. We certainly do not condone the use of hearsay to present a case to the jury, but the primary consequence of the trial court's ruling excluding the testimony of these several witnesses was that the jury did not see the witnesses testify live.

The Court of Appeal found the trial court's ruling prejudicial error. In the court's words, "this is the rare case in which the trial court abused its discretion," because defendant's mental state "was the lynchpin of his defense" and the excluded testimony "was crucial to the defense's position that defendant's delusional mental state was not falsely fabricated after he committed the crime." Under these circumstances, the Court of Appeal reasoned, defendant was deprived of his state and federal constitutional rights to due process of law.

The Court of Appeal's analysis cannot withstand scrutiny. Not only did the jury learn the substance of the excluded testimony, but the People never challenged the accuracy of the witnesses' statements or Dr. Schaffer's description of those statements, and therefore the credibility of these witnesses was simply not a central issue. In fact, after the defense made its offer of proof regarding these witnesses, the district attorney explained to the court: "I am not contesting that the statements he read are true. I mean, if the witnesses come in, I wouldn't intend on suggesting in any way that they are making this stuff up." Moreover, in closing argument to the jury, the district attorney referred to Dr. Schaffer's testimony and said: "[I]f the psychotic disorder is true that the psychiatrist was telling you about, that he actually has some real delusions, *and it sounds like that's true.* [¶] *He's having some real delusions the week before and up to this very day.* These real delusions probably have an impact on him, right? That's no problem with that. Everybody can buy that. *I think we can all be on the same page that this is going on . . . ."* (Italics added.) The district attorney's strategy, in other words, was to concede the existence of defendant's mental problems but argue there was no evidence that defendant actually believed an imminent

peril necessitated the use of deadly force at the moment the shooting occurred. (See *Christian S., supra,* 7 Cal.4th at p. 783.) As the district attorney put it: "These are issues that show that he has moments certainly of lucidity and clarity. [¶] And when he's over there at the house we don't know what happened for sure. We don't know what's in his head. [¶] . . . [¶] Where's the evidence? Where's the evidence in his head that at that moment he said, oh, my gosh, I know I have an [actual] unreasonable belief in the need to defend myself against this imminent peril right now. I've got to do it, boom. [¶] You know what, there's no evidence of that." Thus, defendant's actual belief *at the time of the shooting* was the critical issue in the case, not the general existence of his abnormal mental condition, and testimony of live witnesses who would have described defendant's general state of mind at various times *prior to* the shooting would not have affected the jury's assessment of that critical issue in any way, because (1) the jury learned the substance of this testimony through Dr. Schaffer, and (2) the prosecution conceded the truth of the statements recounted by Dr. Schaffer, as well as Dr. Schaffer's diagnosis of psychotic delusions.

The Court of Appeal, relying in part on *Crane v. Kentucky* (1986) 476 U.S. 683 [90 L.Ed.2d 636, 106 S.Ct. 2142], concluded that exclusion of this testimony was so serious an error that it violated defendant's right to a fair trial under the federal Constitution, and defendant, also relying on *Crane,* argues that the trial court's ruling prevented the jury from assessing the credibility of his defense. In *Crane,* the credibility of the defendant's confession was the central issue in the case, and the high court held that the trial court in that case erred in excluding evidence related to the circumstances of the confession, because that evidence bore on the question of credibility. (*Id.* at pp. 690–691.) Here, on the other hand, the People did not contest the accuracy of Dr. Schaffer's hearsay account of defendant's delusional behavior, and in fact the People conceded that defendant was having the delusions that the excluded witnesses would have described. Therefore, contrary to defendant's assertion, the exclusion of their testimony did not impact the credibility of his defense as directly as the exclusion of evidence that was at issue in *Crane.*

■ Because the circumstances at the time of the shooting only weakly support the conclusion that defendant was acting at that time under a delusional belief that he was under attack (cf. *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1263 [115 Cal.Rptr.2d 229]), the evidence of other paranoid delusions prior to the shooting was of some importance—but the jury heard about this paranoid and delusional behavior from defendant's friend Clarence Redoble. The trial court's decision to bar additional testimony to the same effect (but to allow Dr. Schaffer to describe the substance of this

excluded evidence) arguably did not violate Evidence Code section 352, but we need not decide the question. Even if we assume the trial court erred, and if we assume the error was so grave as to implicate defendant's federal due process rights, the exclusion of this evidence was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

### III. CONCLUSION

Assuming that the trial court erred in its evidentiary ruling, we find that error to be harmless. Accordingly, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BROWN, J.,** Concurring.—A series of flawed decisions and patchwork legislative solutions has left the law governing homicide in California confusing and in some cases anomalous. For the reasons stated in my majority opinion, *ante*, we cannot decide the issue we had intended to decide in this case, but considering the impenetrable labyrinth that California's homicide law has become, perhaps the Legislature is better situated to provide the answer than we are. I write this concurrence to describe how we got ourselves into this labyrinth and to suggest the way out.

Much of the confusion is traceable to our efforts to define malice aforethought. "California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066] (*Rios*).) But what exactly is malice in this context? The plain text of Penal Code section 188[1] seems to suggest that intent unlawfully to kill *by itself* establishes malice: Malice "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." Voluntary manslaughter (§ 192, subd. (a)), however, requires proof of "purpose and design," as opposed to mere "accident," and therefore the element of malice that differentiates murder from manslaughter must be something more than simple intent. (See *People v. Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911] (*Conley*), quoting *People v. Gorshen* (1959) 51 Cal.2d 716, 730, fn. 11 [336 P.2d 492] (*Gorshen*), italics omitted.) What is that "something more"?

---

[1] All further statutory references are to the Penal Code.

## I.

We have construed the statutory definition of malice in a series of cases considering the relevance of a defendant's abnormal mental condition in the context of a homicide prosecution. *Gorshen, supra*, 51 Cal.2d 716, for example, involved what appeared on its face to be a deliberate and premeditated murder. The defendant, a longshoreman, drank enough gin during the course of his work shift to become intoxicated. His foreman confronted him, told him to go home, and the two began to fight. In the course of this brawl, the defendant suffered a cut below his eye, requiring several stitches. (*Id.* at p. 720.) When the defendant returned to work the same night, he was told to go home. He asserted that he would do so, but that he would return with his gun and kill the foreman. (*Ibid.*) He then went home, fired his gun once, returned, and shot the foreman in the stomach. (*Id.* at pp. 720–721.) At his trial, the defendant presented evidence that he suffered from a form of schizophrenia that caused him to have sexual hallucinations. (*Id.* at p. 722.) Recent anxiety over sexual dysfunction had exacerbated these hallucinations, and his self-esteem was, as a result, tied closely to "his ability in his work." The defense expert, a psychiatrist, testified that, on the night of the shooting, the defendant's mental condition caused him to perceive the foreman's instruction to go home as the equivalent of: " 'You're not a man, you're impotent, . . . you're a sexual pervert.' " (*Ibid.*) The psychiatrist explained that the defendant was at that moment on the verge of complete loss of sanity, and his mind compensated for the crisis by clinging obsessively to the thought of killing the foreman. The shooting then resolved that mental crisis. (*Ibid.*)

The trial court found the defendant guilty of second degree murder. (*Gorshen, supra*, 51 Cal.2d at p. 719.) In affirming the conviction, we held that the psychiatrist's testimony was proper evidence because it was relevant to whether the defendant had acted with the requisite specific intent. (*Id.* at pp. 726–727.) We also considered whether an "abnormal mental . . . condition (whether caused by intoxication, by trauma, or by disease, but not amounting to legal insanity or unconsciousness)" could negate malice, reducing murder to manslaughter. (*Id.* at p. 731.) We concluded that it could, disapproving a long line of cases that suggested otherwise. We reasoned that malice was, in this regard, a mental state like any other, and a defendant's abnormal mental condition was relevant to determining the presence of that mental state. (*Id.* at pp. 731–733.)

In *Conley, supra*, 64 Cal.2d 310, we again considered the relevance of intoxication evidence in a homicide prosecution. The defendant in *Conley* had been romantically involved with Elaine McCool until she reconciled with her husband, Clifton McCool. (*Id.* at pp. 314–315.) After a multiday drinking

binge, the defendant purchased a rifle and tested it. (*Id.* at p. 315.) He told friends he wanted to kill the McCools, but his friends dismissed the threat because he was intoxicated. (*Ibid.*) He continued to drink. He next went to the group of cabins where the McCools lived and visited other friends. (*Ibid.*) He repeated that he wanted to kill the McCools and then left his friends' cabin. A few minutes later, four shots rang out. Witnesses saw the defendant shoot Elaine McCool as she was running from him. (*Ibid.*) A jury convicted the defendant of the first degree murders of both Elaine and Clifton McCool (*id.* at p. 314), but we reversed the convictions because the trial court had failed to give the jury instructions on manslaughter, and also failed to define malice and explain that malice is an essential element of murder. (*Id.* at pp. 319–320.)

In our opinion, we reaffirmed the principle stated in *Gorshen* that a defendant's mental condition (including intoxication) at the time of a homicide is relevant to the issue of malice aforethought (*Conley, supra,* 64 Cal.2d at pp. 317–318), but then we went a step further. The Attorney General argued that the first degree murder convictions necessarily included a finding of deliberation and premeditation and that the jury had therefore found malice. (*Id.* at p. 320.) We disagreed, and in so doing we had to define malice in a way that distinguished it from intent. In other words, we had to carve out a class of murders that might somehow be deliberate and premeditated but not malicious. (*Id.* at pp. 320–323.) In that context, we divined an awareness-of-civic-duty component of malice aforethought, stating: "An awareness of the obligation to act within the general body of laws regulating society . . . is included in the statutory definition of . . . malice . . . ." (*Id.* at p. 322.) By adding that gloss to the definition, malice aforethought became something clearly distinct from intent, and under this new definition, a defendant's "diminished capacity" (*id.* at p. 318) due to intoxication or other mental condition might leave him unaware of his duty to act lawfully but still able to act with intent, deliberation, and premeditation. (*Id.* at p. 323.) We specifically cited *Gorshen* as an example of a fact scenario in which one might act with deliberation and premeditation—declaring an intent to kill, going home, test-firing a gun, returning, and killing—but not with malice, because one was not able to appreciate one's duty to act within the law. (*Conley, supra,* 64 Cal.2d at pp. 322–323.)

Moreover, this same revised definition of malice justified the need for manslaughter instructions. If malice aforethought were closely tied to intent, then any factual defense that might disprove malice would also tend to disprove intent, making a voluntary manslaughter conviction inappropriate and voluntary manslaughter instructions unnecessary. But, by defining malice in a way that sharply distinguished it from intent, we created the possibility

that the evidence might disprove malice but nevertheless establish an intentional unlawful killing, making a voluntary manslaughter conviction appropriate. In short, by an accretion upon the statutory definition of malice, we were able to create an element of murder that could be disproved by diminished capacity evidence without simultaneously disproving intent to kill. This accretion, therefore, provided the logical basis by which diminished capacity might reduce murder to voluntary manslaughter.

## II.

Various 1981 amendments to the Penal Code were expressly intended to eliminate the diminished capacity defense. (See *In re Christian S.* (1994) 7 Cal.4th 768, 774–775, 781–782 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*).) Thus, the Legislature announced: "As a matter of public policy there shall be no defense of diminished capacity . . . in a criminal action . . . ." (§ 28, subd. (b).) The electorate passed a complementary initiative in 1982 that provided in part: "The defense of diminished capacity is hereby abolished." (§ 25, subd. (a).) Nevertheless, as long as a specific state of mind is a necessary element of an offense, a defendant cannot be prohibited from presenting relevant evidence raising a doubt about whether that state of mind was present. Therefore, the 1981 amendments did not preclude the defense of "diminished actuality"—that nonsensical phrase being judicial shorthand for the actual lack of a requisite mental state, due to an abnormal mental condition. (See, e.g., *People v. Steele* (2002) 27 Cal.4th 1230, 1253 [120 Cal.Rptr.2d 432, 47 P.3d 225], italics omitted (*Steele*).) Hence, even after the 1981 amendments, intoxication evidence could still produce an acquittal in a murder prosecution. A key component, however, of the diminished capacity defense had been that it offered jurors *the middle option of a voluntary manslaughter conviction* rather than the stark choice between a murder conviction and a complete acquittal. To eliminate that middle option, the 1981 amendments rejected the awareness-of-civic-duty gloss we had put on the definition of malice aforethought. As amended, section 188 now provides: "Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

As a result of this statutory change, a defendant who announced his intent to kill, and then took methodical steps to do so, could not pursue the compromise verdict of voluntary manslaughter on the theory that intoxication or other mental condition had clouded his awareness of his duty to act within the law. That, in any case, was our holding in *People v. Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588]. In *Saille,* the defendant argued that, because the 1981 amendments did not eliminate diminished *actuality*, intoxication evidence could still negate malice and reduce murder

to voluntary manslaughter. (*Id.* at pp. 1112–1113.) We rejected the argument, citing the change to section 188 and concluding that the elimination of the diminished capacity defense effectively eliminated the middle option of voluntary manslaughter in a diminished *actuality* case. (*Saille,* at pp. 1113–1117.) In the course of our opinion, we repeatedly linked malice to intent. We said: "[O]nce the trier of fact finds a deliberate intention unlawfully to kill, *no other mental state need be shown* to establish malice aforethought." (*Id.* at p. 1113, italics added.) We added that "express malice and an intent unlawfully to kill are one and the same" (*id.* at p. 1114), and we twice said that "when an intentional killing is shown, malice aforethought is established" (*ibid.*). Finally, we concluded that "[i]n amending section 188 in 1981, the Legislature equated express malice with an intent unlawfully to kill." (*Id.* at p. 1116.) By closely linking malice to intent, our holding in *Saille* tended to blur the distinction between voluntary manslaughter and second degree murder, seemingly limiting voluntary manslaughter to the statutorily defined instance of "a sudden quarrel or heat of passion." (§ 192, subd. (a).) For simplicity's sake, I will refer to this statutorily defined category of voluntary manslaughter as "heat-of-passion manslaughter."

## III.

Imperfect self-defense was originally a subcategory of heat-of-passion manslaughter, not a distinct doctrine. In fact, at one time we felt the need to clarify that heat-of-passion manslaughter could encompass factual scenarios *other than* imperfect self-defense. (*People v. Logan* (1917) 175 Cal. 45, 49–50 [164 P. 1121] (*Logan*).) Similarly, in *People v. Best* (1936) 13 Cal.App.2d 606 [57 P.2d 168] (*Best*), the Court of Appeal treated imperfect self-defense as a specific type of heat-of-passion manslaughter. Discussing imperfect self-defense, the court stated: " 'The dividing line between self-defense and this character of manslaughter seems to be the existence, as the moving force, of a reasonable founded belief of imminent peril to life or great bodily harm [leading to an acquittal based on self-defense], as distinguished from the influence of an uncontrollable fear or terror, conceivable as existing, but not reasonably justified by the immediate circumstances[, leading to a manslaughter conviction].' " (*Id.* at p. 610, quoting *Commonwealth v. Colandro* (Pa. 1911) 231 Pa. 343 [80 A. 571, 574].) Thus, according to the traditional view, imperfect self-defense, like other forms of heat-of-passion manslaughter, involved a killing committed in a state of passion, but the passion at issue was not rage or intense jealousy; rather, the killer believed (in the passion of the moment) that he had to use deadly force to repel an imminent threat of death or serious bodily injury. The *Best* court noted, however, the long-standing rule that "adequate provocation" must underlie the defendant's heat of passion for it to support a reduction of murder to manslaughter. (*Best,* at p. 610, citing *People v. Freel* (1874) 48 Cal. 436,

437.) In a case where there was "no considerable provocation," and the elements of murder were otherwise satisfied, malice was implied, and a murder conviction was appropriate. (§ 188.) In addition, the *Best* court made clear that, in the case of imperfect self-defense, the fear of death or great bodily injury, though unreasonable, must nevertheless be "caused by the circumstances." (*Best*, at p. 610.) This language tends to ground imperfect self-defense in some objective circumstance that the defendant could conceivably interpret as threatening. Thus, it was not the absence of objective circumstances, but the unreasonable response to those circumstances—a miscalibration—that characterized imperfect self-defense.

In short, the Court of Appeal, in *Best, supra,* 13 Cal.App.2d 606, expressly endorsed a *reasonably unreasonable* standard for imperfect self-defense. (But see *People v. Uriarte* (1990) 223 Cal.App.3d 192, 197 [272 Cal.Rptr. 693] (*Uriarte*).) The "provocation" or threatening "circumstances" must be adequate, but at the same time, the deadly force exerted in response must be " 'not reasonably justified.' " (*Best,* at p. 610.) As awkward as this reasonably unreasonable standard might seem on its face, it is quite consistent with manslaughter as that crime has been historically understood. Manslaughter is, of course, a class of *criminal* behavior, and therefore it necessarily implies *unreasonable* conduct—that is, conduct falling short of the minimum standards society imposes on its members—but we have nevertheless always held that the heat of passion that justifies reducing murder to voluntary manslaughter must be based on "circumstances . . . sufficient to arouse the passions of the *ordinarily reasonable man.*" (*Logan, supra,* 175 Cal. at p. 49, italics added.) Therefore, the intermediate, reasonably unreasonable standard has always been an aspect of voluntary manslaughter—for manslaughter is, after all, a *middle* option between murder and complete exculpation.

In *People v. Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1] (*Flannel*), we approved the reasoning of *Best,* expressly adopting imperfect self-defense as a category of voluntary manslaughter (*Flannel,* at pp. 675–676), but we disconnected it from heat-of-passion manslaughter (*id.* at pp. 677–678). We separated these doctrines because imperfect self-defense by definition involves an *unreasonable* response to the circumstances (for otherwise it would be *true* self-defense), whereas heat-of-passion manslaughter requires a provocation that would arouse the passions of a " '*reasonable* person.' " (*Id.* at p. 678, italics added.) We believed these standards to be mutually inconsistent. (*Ibid.*) We did not, however, recognize that even in the case of heat-of-passion manslaughter (where the defendant's passion must, by definition, be reasonable), the defendant's conduct is certainly *unreasonable* in the sense that manslaughter constitutes a serious crime, not an exculpation. Therefore, the reasonableness component of heat-of-passion manslaughter has always managed to coexist with the recognition that we are talking about a defendant who has acted unreasonably.

In short, *unreasonable* conduct has always been a component of heat-of-passion manslaughter, as well as imperfect self-defense, and that element of unreasonableness is perfectly consistent with a countervailing requirement of some minimum objective measure of reasonableness. Therefore, in deciding *Flannel*, we could have left imperfect self-defense linked to heat-of-passion manslaughter but simply defined reasonableness in a way that was appropriate to the specific facts under consideration. As we shall see, our decision instead to conjure a *nonstatutory* category of voluntary manslaughter (see *Flannel*, *supra*, 25 Cal.3d at p. 677, fn. 3; *Rios*, *supra*, 23 Cal.4th at p. 465) has led to several problems.

## IV.

The *Flannel* decision rested in part on the same awareness-of-civic-duty definition of malice that we had adopted in *Conley*. Specifically, we decided that the state of mind associated with imperfect self-defense—that is, an actual belief in "the need to repel imminent peril or bodily injury"—would necessarily render one unaware "that society expects conformity to a different standard" and therefore incapable "of comprehending [one's] societal duty to act within the law." (*Flannel*, *supra*, 25 Cal.3d at p. 679.) Therefore, the 1981 amendments to the Penal Code, eliminating the awareness-of-civic-duty component of malice, called into question our holding in *Flannel*. Nevertheless, we concluded in *Christian S.* that the history of the 1981 amendments did not suggest any intent to eliminate imperfect self-defense as a basis for a manslaughter conviction, and we were loath to assume that the Legislature had eliminated this legal theory by legislative accident. Accordingly, we held that imperfect self-defense remained a viable theory for negating malice and that, by negating malice, it did not also negate intent, and therefore a voluntary manslaughter conviction remained possible. (*Christian S.*, *supra*, 7 Cal.4th at p. 771.) In reaching this conclusion, we implicitly retreated from our repeated statements in *Saille* that equated malice aforethought with intent unlawfully to kill, and that implicit retreat became explicit in *Rios*, *supra*, 23 Cal.4th 450.

In *Rios*, *supra*, 23 Cal.4th 450, we held that voluntary manslaughter is a lesser included offense of second degree murder. We reasoned that imperfect self-defense and heat of passion are not *elements* of voluntary manslaughter, but rather they are alternative means of raising a doubt about the element of malice in a murder prosecution. Therefore, though "malice" and "intent to unlawfully kill" are "[g]*enerally*" one and the same (*id.* at p. 460, italics added), malice is narrower, implying intent combined with an absence of the factors that would reduce the killing to manslaughter. (*Id.* at pp. 460–462, 469.)

## V.

As this history of our law makes clear, our cases construing heat-of-passion manslaughter have always emphasized the necessity of reasonableness as regards the defendant's passionate reaction, because "no defendant may set up his own standard of conduct and justify or excuse himself [simply] because in fact his passions were aroused." (*Logan, supra,* 175 Cal. at p. 49; see *People v. Cole* (2004) 33 Cal.4th 1158, 1215–1216 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *Steele, supra,* 27 Cal.4th at p. 1252; *People v. Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311]; *People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]; *People v. Danielly* (1949) 33 Cal.2d 362, 377 [202 P.2d 18]; *People v. Valentine* (1946) 28 Cal.2d 121, 137 [169 P.2d 1].) But in *Flannel,* by disconnecting imperfect self-defense from heat-of-passion manslaughter, we arguably disconnected it also from this long-standing reasonableness requirement—and, if so, allowed defendants to set up their own standards of conduct. In all imperfect self-defense cases, like all heat-of-passion manslaughter cases, the defendant certainly acts unreasonably, but the defendant's conduct should still be measured against some minimum objective standard. Otherwise, a hyperparanoid and delusional defendant would be a law unto himself, hallucinating violent attacks and then killing innocent people with impunity as regards a murder conviction. That result would fly in the face of 90 years of precedent requiring that actions of a defendant seeking to negate malice exhibit some objective reasonableness. It would also stand in sharp contrast to the rule adopted in other jurisdictions as regards imperfect self-defense. (See, e.g., *State v. Ordway* (Kan. 1997) 261 Kan. 776 [934 P.2d 94, 104] ["the 'unreasonable but honest belief' necessary to support the 'imperfect right to self-defense manslaughter' cannot be based upon a psychotic delusion"]; *Peterson v. State* (Md.Ct.Spec.App. 1994) 101 Md.App. 153 [643 A.2d 520, 522] ["we conclude that the imperfect self-defense instruction should not be given unless the evidence generates the issue of whether, under the circumstances, the defendant was entitled to take *some* action against the victim"]; *State v. Powell* (N.J. 1980) 84 N.J. 305 [419 A.2d 406, 410] [approving a claim of imperfect self-defense "where the exercise of 'self-defense' was provoked *by an act* that clouded the defendant's perceptions as to the imminence of danger, the extent of the danger, or the amount of force called for to eliminate the danger" (italics added)]; *Com. v. Bracey* (Pa. 2001) 568 Pa. 264 [795 A.2d 935, 947] [although defendant claimed that abuse as a child left him with an " 'exaggerated startle response,' " "there was absolutely no evidence that [defendant] acted in self-defense—imperfect or otherwise"]; *Com. v. Sheppard* (Pa.Super.Ct. 1994) 436 Pa.Super. 584 [648

A.2d 563, 569] [imperfect self-defense "is more in the nature of perception based upon faulty analysis of the circumstances, or state of mind arising from a pattern or history of interaction, which would lead to a reaction based on fear of one's safety arising out of previous abuse"]; *id.* at p. 570 ["[t]he appellant's alleged subjective cognitive process under case law is not a factor for consideration unless and until the objective determination has been made . . . that a basis exists for such a perception"]; *State v. Seifert* (Wis. 1990) 155 Wis.2d 53 [454 N.W.2d 346, 352] ["The doctrine of imperfect self-defense manslaughter was simply never intended to cover situations such as this one where it is entirely the defendant's mental disease or defect, not an error in judgment or perception or a negligently-formed perspective of the situation, that motivates the defendant's actions"]; cf. *State v. Head* (Wis. 2002) 2002 WI 99, 648 N.W.2d 413, 436–437 [255 Wis.2d 194].)

Of course, imperfect self-defense is a "judicially developed theory" (*Rios, supra,* 23 Cal.4th at p. 465), and therefore, as the creators of this theory, we could judicially ensure a requirement of reasonable objective circumstances, thereby making this category of manslaughter consistent with our long-standing rule that a defendant should not be able to set up his own standard of conduct. In fact, the requirement announced in *Best, supra,* 13 Cal.App.2d at page 610, and reiterated in our cases (see *Christian S., supra,* 7 Cal.4th at p. 776; *Flannel, supra,* 25 Cal.3d at p. 676), that the defendant's fear must be "caused by the circumstances" indicates that, since its inception, imperfect self-defense has required a showing of some objective circumstances that the defendant could conceivably interpret as a threat. The problem, however, is that we are not dealing with the common law, but rather construing a criminal statute, and we cannot simply make new law, though that is precisely what we did in *Flannel* by creating a category of manslaughter that "is not expressed in the statutory scheme at all." (*Rios,* at p. 465.) In short, we are confined by the statutory scheme, though by disconnecting imperfect self-defense from heat-of-passion manslaughter, we broke out of the statutory scheme into uncharted territory.

For example, one can argue that, because the element of malice refers to a subjective state of mind, the defendant's *actual belief*—reasonable or wholly delusional—is the only relevant consideration as regards proof of malice in a murder prosecution. In other words, the *reasonableness* of a defendant's belief in the need for self-defense is of no consequence; so long as the unreasonable defendant actually, in fact, had that belief, he had the same *subjective* mental state as one whose belief was reasonable, and he did not act with malice or commit murder. (See, e.g., *People v. Wells* (1949) 33 Cal.2d 330, 344–345 [202 P.2d 53]; *Uriarte, supra,* 223 Cal.App.3d at p. 197.) The anomaly in this reasoning is that, in the case of heat-of-passion manslaughter,

we have *always* required some objective reasonableness, though the act of manslaughter is inherently unreasonable. A person who *unreasonably and delusionally* reacts to a *minor* provocation may have the same subjective mental state as a person who *reasonably and accurately* reacts to a *major* provocation, but in the case of heat-of-passion manslaughter, the law imputes malice (*regardless of the defendant's actual mental state*) "when no considerable provocation appears." (§ 188; cf. *People v. Padilla* (2002) 103 Cal.App.4th 675, 678–679 [126 Cal.Rptr.2d 889].) Thus, the defendant's actual subjective mental state is, at least to that extent, deemed to be irrelevant, and a murder conviction is appropriate. With respect to imperfect self-defense, however, we are dealing with a judicially created gloss on the voluntary manslaughter statute, and therefore the statutory basis for imputing malice to a defendant who acts in response to a very minor or wholly nonexistent threat is uncertain. We can cite as a limitation on imperfect self-defense the long-standing objective requirement that it be "caused by the circumstances" (*Best, supra*, 13 Cal.App.2d at p. 610; see *Christian S., supra*, 7 Cal.4th at p. 776; *Flannel, supra*, 25 Cal.3d at p. 676), but doing so does not necessarily solve the problem of how, without a statutory provision, we can fictionally impute malice where there is no actual malice in the defendant's delusional inner world.[2]

A further complication arises when voluntary intoxication is the source of the defendant's unreasonable response to a very minor or wholly nonexistent threat. If the defendant in such a case were to claim heat-of-passion manslaughter, malice would be implied on account of the insufficiency of the provocation (§ 188), and of course evidence of voluntary intoxication is, by statute, inadmissible on the question of implied malice (§ 22, subd. (b)). Therefore, the intoxication evidence would be excluded, and the defendant would be guilty of murder. If, on the other hand, the defendant claimed imperfect self-defense, the same intoxication-produced delusions would arguably negate malice and reduce murder to manslaughter. This anomaly is illogical in itself, and it has the further mischief of frustrating the Legislature's clear intent to eliminate the diminished capacity defense. If imperfect self-defense may be based on intoxication-produced delusions, then a defendant can still use diminished capacity evidence to obtain a compromise verdict of manslaughter, simply by asserting that his intoxication (or other abnormal mental condition) caused him to believe he was facing an imminent threat of death or serious bodily injury.

---

[2] If we were to hold that imperfect self-defense is unavailable to a delusional defendant who cannot identify sufficient provocation, that defendant would not be without a remedy. The defendant would be able to invoke the defense of unconsciousness (§ 26) or insanity (§ 25, subd. (b)), if applicable.

Finally, our law should recognize that intoxication can affect a person in two opposing ways. It can cause a person *not to perceive* a risk that is *real*, as is common in the case of alcohol abuse (see, e.g., *People v. Whitfield* (1994) 7 Cal.4th 437, 442–444 [27 Cal.Rptr.2d 858, 868 P.2d 272]), and it can cause a person *to perceive* a risk that is *not real*, as is common in the case of cocaine or methamphetamine abuse. The Legislature has made clear that, in the former situation, a defendant may be convicted of second degree murder on an implied malice theory, and the evidence of voluntary intoxication is not admissible. (§ 22, subd. (b).)[3] Logic suggests that a similar rule should apply when voluntary intoxication causes the opposite effect. One who voluntarily takes a drug that causes hallucinations of an imminent peril should not be able to kill innocent people and then claim intoxication as a defense to a murder charge. The point we made long ago in a different context remains pertinent here: " 'In the forum of conscience, there is no doubt considerable difference between a murder deliberately planned and executed by a person of unclouded intellect, and the reckless taking of life by one infuriated by intoxication; but human laws are based upon considerations of policy, and look rather to the maintenance of personal security and social order, than to an accurate discrimination as to the moral qualities of individual conduct.' " (*People v. Blake* (1884) 65 Cal. 275, 277 [4 P. 1], quoting *The People v. Rogers* (1858) 18 N.Y. 9, 18.)

## VI.

As must be apparent, all these various problems and anomalies arise from our misstep in 1979 in *Flannel*, when we waved our judicial magic wand and created a new nonstatutory category of manslaughter rather than keeping imperfect self-defense linked to heat-of-passion manslaughter. Having created it from thin air, we are now stuck with the unpleasant reality that what we created does not fit the statutory scheme the Legislature crafted. The only sensible solution, then, would be to correct the error we made over a quarter-century ago and once again locate imperfect self-defense within the statutory category of heat-of-passion manslaughter. The Legislature could easily correct our 1979 misstep by providing clear definitions of malice and imperfect

---

[3] Voluntary intoxication is, however, admissible on the question of *express* malice. (§ 22, subd. (b).) Under current law, then, an intoxicated defendant who kills while driving with a conscious disregard for human life may not rely on evidence of intoxication to rebut implied malice, but the same defendant who *intends* to kill unlawfully may rely on such evidence to rebut express malice. I note that nothing in the Constitution compels this anomaly. (*Montana v. Egelhoff* (1996) 518 U.S. 37, 56 [135 L.Ed.2d 361, 116 S.Ct. 2013] (plur. opn. of Scalia, J.); *id.* at pp. 58–59 (conc. opn. of Ginsburg, J.).)

self-defense, and I urge the Legislature to do so, thereby restoring coherence and common sense to California's homicide law. Of course, if no legislative fix is forthcoming, we will continue to do our best to see our way through this forest of anomalies.

Baxter, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied June 29, 2005. Brown, J., did not participate therein.