Filed 7/30/14  P. v. Griffith CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HOWARD EUGENE GRIFFITH,<br><br>    Defendant and Appellant. | H039951<br>(Santa Clara County<br>Super. Ct. No. C1242445) |

## I.  INTRODUCTION

Defendant Howard Eugene Griffith was found incompetent to stand trial, committed to Napa State Hospital, and ordered to be involuntarily treated with antipsychotic medication.  Defendant appeals from the order authorizing involuntary antipsychotic medication.  He contends the order is not supported by substantial evidence that without antipsychotic medication, "it is probable that serious harm to the physical or mental health of [defendant] will result."  (Pen. Code, 1370, subd. (a)(2)(B)(i)(I).)[1]  We find substantial evidence supports that finding and we will therefore affirm the order authorizing involuntary antipsychotic medication.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

## II. BACKGROUND

### A. Criminal Offense[2]

On the morning of October 7, 2012, defendant stabbed Nanito Osei with a steak knife. When police arrived, Osei was lying on the ground, bleeding. Osei pointed to defendant, who was sitting nearby, and identified defendant as the perpetrator. Police recovered a knife from a trash can and took defendant into custody.

Defendant told the police he had met Osei earlier that day. Osei wanted to take a hat from defendant's head, and they argued. Osei tried to punch defendant. Defendant stabbed Osei, then threw the knife in the trash can. Defendant told police he was a transient who had been homeless for several years. Defendant also said he was an undercover secret service agent.

### B. Charges and Competency Proceedings

By information filed on November 8, 2012, defendant was charged with assault with a deadly weapon.[3] (§ 245, subd. (a)(1).) On January 7, 2013, the trial court declared a doubt about defendant's competency and suspended the criminal proceedings. (See § 1368.) The court appointed two psychologists to evaluate defendant's competency: Dr. Roger Karlsson and Dr. Ashley Cohen.

Dr. Cohen interviewed defendant on January 14, 2013. Defendant had difficulty focusing his attention on the interview. "[H]e was preoccupied with attempting to explain the relationship among several 'secret government spy agencies,' one or more with which he is affiliated." Defendant was unable to restate the purpose of the interview after Dr. Cohen explained it to him. Defendant was unable to recall his exact age, which

---

[2] Our summary of the facts underlying the criminal charge is based on the transcript of the preliminary hearing.

[3] On December 28, 2012, the District Attorney moved to amend the information to add great bodily injury allegations. (§§ 1203, subd. (e)(3), 12022.7, subd. (a).) It is not clear whether the motion was granted.

was 65. When anxious, defendant would pull the back of his shirt over his head, stating that he needed to protect the back of his neck and head. He was "hyperalert," and his "grooming and hygiene were marginal." He often became distracted by his own thoughts while speaking. He was "obsessed with at least four topics: he is the employee of one or more secret spy agencies, he is a world famous boxing promoter, he is cousins with President Obama's two daughters, and he is being represented by a famous criminal defense attorney from Chicago (sent to represent him by the President, because of his relationship with the daughters)." Regarding the present charges and legal proceedings, defendant reported stabbing the victim but claimed the victim was one of three men who had jumped him and that two CIA agents had killed the other two attackers. Defendant was not worried about the criminal charges because, he believed, the CIA agents and 145 other people would testify on his behalf.

Dr. Cohen opined that defendant was not competent to stand trial. She described him as "grossly delusional" and believed that his "cognitive abilities have degraded to the extent that he is unable to proceed with trial in a rational manner, and is unable to engage in normal, productive interactions with his attorney." Dr. Cohen did not know how long defendant had suffered from the same symptoms and did not know if defendant was on antipsychotic medication, but she believed it could be "worthwhile" to administer medication to defendant. Dr. Cohen believed that upon release from custody, defendant should be evaluated for a possible conservatorship. She explained, "given his present state, he is highly unlikely to be able to provide even minimally for his basic food, clothing, shelter, and safety needs."

Dr. Karlsson attempted to evaluate defendant on March 6, 2013. He administered two tests, but during his administration of a third test, defendant refused to continue. Dr. Karlsson could not assess defendant for trial competency based on the partial evaluation.

On March 13, 2013, the trial court appointed psychologist Andrea Shelley to perform another competency evaluation. Dr. Shelley interviewed defendant on March

18, 2013. She reported that defendant had been "psychiatrically hospitalized for the first time for three months" when he was 23 years old. He had taken medications but could not recall which ones. He had worked as a janitor and a roofer until age 36, when he was diagnosed with schizophrenia and began receiving social security disability income. He did not remember the last time he had taken antipsychotic medication and had not received any mental health services for "quite some time."

Defendant reported being depressed, having no appetite, and experiencing insomnia. He denied having any auditory or visual hallucinations, but he "expressed several delusions[,] specifically that he was an undercover secret service agent." He repeated his delusions about being related to President Obama, having Chicago attorneys to defend him, and having witnesses from the CIA. Defendant had "a fair factual knowledge of court processes and procedures" but became agitated when discussing "different pleas."

Dr. Shelley believed that because of his focus on the delusions and his agitation, defendant would not be able to "rationally work with his attorney and assist in his defense." Thus, Dr. Shelley opined that defendant was not competent to stand trial. She also opined that "psychotropic medication could be helpful in restoring him to competency," but that "it might be necessary to involuntarily medicate him" in order to do so. Dr. Shelley did not believe there was anything "to indicate that he is a danger to himself" but noted that his "impulse control may be impaired due to his psychosis and paranoia."

On April 17, 2013, the trial court found defendant incompetent to stand trial, based on Dr. Cohen's and Dr. Shelley's reports. The court issued an order for an evaluation of treatment options and appointed psychiatrist Dr. John Greene to evaluate defendant for a possible order of involuntary antipsychotic medication. On April 26, 2013, the South Bay Conditional Release Program recommended that defendant be committed to the Department of State Hospitals for placement.

### C. *Involuntary Medication Proceedings*

Dr. Greene evaluated defendant on April 29, 2013. He opined that defendant's "mental disorder of Psychotic Disorder Not Otherwise Specified[] requires medical treatment with antipsychotic medication." He further opined that without antipsychotic medication, defendant's "mental health would be substantially compromised, and that eventually, serious harm will come to him regarding his mental health." Dr. Greene specified that defendant's delusions and lack of insight into his mental illness would likely exacerbate and continue to impair his functioning. Defendant was not willing to take antipsychotic medication voluntarily, and Dr. Greene believed defendant lacked the capacity to make that decision. Dr. Greene did not believe that any less intrusive treatments would have substantially the same results. Dr. Greene also did not believe that defendant was currently a danger to himself or others.

On July 11, 2013, the court held a hearing on the issue of whether to issue an order for involuntary antipsychotic medication. Dr. Greene reiterated his opinion that defendant's mental disorder required treatment with antipsychotic medication. Dr. Greene explained his opinion was based on the evaluation, defendant's denial about his mental illness, and defendant's medical records, which suggested defendant had a long history of psychotic illness.

Defendant was initially "appropriate" during the evaluation, but he became "argumentative and potentially aggressive" when the topic of the criminal proceeding was brought up. Dr. Greene was concerned that defendant would harm or threaten him. Dr. Greene believed that without antipsychotic medication, defendant would become "gravely disabled because of his mental illness and he could possibly be harmful to others if he is provoked."

At the end of the hearing, the trial court asked Dr. Greene to explain why he believed defendant's "mental health would be substantially compromised and that eventually serious harm would come to him regarding his mental health if he's not treated

5

with antipsychotic medication." Dr. Greene referred to defendant's "substantial delusions and substantial impairment in his ability to assess himself." Dr. Greene noted that defendant was presently "in a structured environment, being incarcerated, so he's given food and clothing and shelter," but that if he was not, "he would not be able to interact with others appropriately to provide for food, shelter and clothing for himself."

Dr. Greene also believed that defendant was "at a high risk of harming somebody else," due to his "inability to regulate [his] emotions." The trial court noted that Dr. Greene had expressed the opposite opinion in his written evaluation. Dr. Greene explained that defendant's delusions were not related to hurting others, but that "if he were pushed, then he could become dangerous."

When asked about alternative treatments, Dr. Greene stated, "He's not going to get better without medication. He's going to stay exactly like he is, and he will always be a threat because the alternative treatments are not going to help with delusions and hallucinations."

The trial court found "by clear and convincing evidence that [defendant] does not have the capacity to consent to medications." The court found there was "some question" as to whether defendant would qualify for involuntary medication under section 1370, subdivision (a)(2)(B)(i)(II), but made a finding under section 1370, subdivision (a)(B)(i)(I) "that he does lack the capacity." The court ordered defendant transported to Napa State Hospital. The court's written order specifies that the involuntary medication order is "pursuant to [Penal Code] § 1370(a)(2)(B)(i)(I)."

### III.    DISCUSSION

#### A.    *Relevant Statutory Provisions*

Once a defendant has been found incompetent, "the trial or judgment shall be suspended until the person becomes mentally competent." (§ 1370, subd. (a)(1)(B).) The court generally must "order that the mentally incompetent defendant be delivered by the

6

sheriff to a state hospital . . . or to any other available public or private treatment facility," for care and treatment. (*Id.*, subd. (a)(1)(B)(i).) A mentally incompetent defendant may also be placed on outpatient status. (*Ibid.*)

Prior to making a placement order, the trial court must order a placement evaluation (§ 1370, subd. (a)(2)(A)) and must "hear and determine whether the defendant lacks capacity to make decisions regarding the administration of antipsychotic medication" (*id.*, subd. (a)(2)(B)). The court may order involuntary administration of medication upon one of three alternative findings, as specified in section 1370, subdivision (a)(2)(B)(i):

"(I) The defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result. Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating. The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant.

"(II) The defendant is a danger to others, in that the defendant has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another while in custody, or the defendant had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another that resulted in his or her being taken into custody, and the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others. Demonstrated danger may be based on an assessment of the defendant's present mental

7

condition, including a consideration of past behavior of the defendant within six years prior to the time the defendant last attempted to inflict, inflicted, or threatened to inflict substantial physical harm on another, and other relevant evidence.

"(III)  The [P]eople have charged the defendant with a serious crime against the person or property, involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial, the medication is unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner, less intrusive treatments are unlikely to have substantially the same results, and antipsychotic medication is in the patient's best medical interest in light of his or her medical condition."[4]

## B.     Analysis

"We review a trial court's order authorizing a state hospital to involuntarily administer antipsychotic medication to defendant for substantial evidence.  [Citation.]" (*People v. O'Dell* (2005) 126 Cal.App.4th 562, 570.)  Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Defendant impliedly concedes there was substantial evidence to support the first two required findings under section 1370, subdivision (a)(2)(B)(i)(I):  that defendant lacked "capacity to make decisions regarding antipsychotic medication," and that defendant's mental disorder "requires medical treatment with antipsychotic medication."

---

[4] The findings required for an order issued pursuant to section 1370, subdivision (a)(2)(B)(i)(III) are derived from *Sell v. United States* (2003) 539 U.S. 166 (*Sell*). (*People v. Christiana* (2010) 190 Cal.App.4th 1040, 1049.)  "The *Sell* factors control only when the sole purpose of the involuntary medication is to render the defendant competent to stand trial [under section 1370, subdivision (a)(2)(B)(i)(III)]; they do not control if involuntary medication is justified on other bases, such as when the defendant is dangerous to himself or others or when the refusal to take medication puts the defendant's own health at grave risk. [Citation.]"  (*Ibid.*, fn. 4.)

Defendant contends there was no substantial evidence to support the third required finding under section 1370, subdivision (a)(2)(B)(i)(I): that "if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the [defendant] will result."

The parties cite no published California case discussing the type of evidence that can support an order for involuntary antipsychotic medication issued pursuant to section 1370, subdivision (a)(2)(B)(i)(I). As noted above, the statute specifies that a finding of probable serious harm to the defendant "requires evidence that the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating." (§ 1370, subd. (a)(2)(B)(i)(I).) The statute further specifies, "The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant." (*Ibid.*)

The evidence in this case supports a finding that "defendant is presently suffering adverse effects to his or her physical or mental health" and thus supports a finding that "if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result." (§ 1370, subd. (a)(2)(B)(i)(I).) The parties appear to agree that the "presently suffering adverse effects" standard of section 1370, subdivision (a)(2)(B)(i)(I) is satisfied when the defendant is exhibiting symptoms of a mental disorder. In this case, the evidence overwhelmingly established that defendant was suffering from serious delusions that were caused by his mental disorder. The evidence thus showed that defendant was exhibiting symptoms of a mental disorder and, therefore, that he was suffering "adverse effects" to his mental health. (*Ibid.*; cf. *People v. Wright* (2005) 35 Cal.4th 964, 970 [expert testimony that delusions are psychotic symptoms]; *People v. Pace* (1994) 27 Cal.App.4th 795, 798 [expert testimony that delusions were a symptom of defendant's

9

severe mental disorder].)  In his written report, Dr. Greene opined that without antipsychotic medication, defendant's "mental health would be substantially compromised, and that eventually, serious harm will come to him regarding his mental health."  Dr. Greene did not specify the type of "serious harm" that would occur, but he did state that defendant's delusions and lack of insight into his mental illness would likely exacerbate and continue to impair his functioning.  The earlier psychological evaluations further established that defendant's delusions were harmful to his mental health in that they caused serious anxiety, an inability to focus, and agitation.

Defendant contrasts the instant case with *United States v. Loughner* (9th Cir. 2012) 672 F.3d 731 (*Loughner*), where the Ninth Circuit held that an involuntary medication order was supported by substantial evidence of the defendant's dangerousnesss to himself.  In *Loughner,* the defendant had been diagnosed with schizophrenia and there was evidence that his mental health had deteriorated after his antipsychotic medication was discontinued.  (*Id.* at pp. 736, 739.)  Specifically, he had begun expressing " 'feelings of depression and hopelessness' " as well as suicidal thoughts.  (*Id.* at p. 757.)  The defendant had also exhibited an erratic sleep schedule, had lost weight due to poor food intake, and "would pace or spin in circles for hours without interruption."  (*Ibid.*)  Following resumption of his involuntary medication, the defendant's agitation had decreased, his sleep had improved, and his communication with staff was progressing.  The Ninth Circuit found substantial evidence to support the finding that the defendant was "a danger to himself and that antipsychotic medication was in his best interest."  (*Id.* at p. 758.)

Defendant acknowledges that "*Loughner* does not require potential suicide for an order for involuntary medication," but argues that the case "shows the type and quality of evidence that is required to forcibly medicate a patient when the claim is that failure to do so will result in mental or physical harm to the person."  As the Attorney General points out, however, *Loughner* is of limited assistance because it did not involve a determination

10

pursuant to section 1370, subdivision (a)(2)(B)(i)(I).  But in any event, the evidence in this case is comparable to that in *Loughner.*  Here, defendant exhibited delusions, which were comparable to the *Loughner* defendant's expressed feelings of depression and suicidal thoughts.  Defendant also exhibited agitation and had a difficult time communicating with evaluators because of his mental illness, similar to the *Loughner* defendant.  The record here contains substantial evidence that defendant was "presently suffering adverse effects" to his mental health (§ 1370, subd. (a)(2)(B)(i)(I)), which supports the trial court's decision to order involuntary antipsychotic medication.

11

## IV.   DISPOSITION

The July 11, 2013 order authorizing the administration of involuntary antipsychotic medication is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MÁRQUEZ, J.

_____
GROVER, J.